Wayne G. TATGE, Plaintiff-Appellant-Cross-Respondent-Petitioner,

v.

CHAMBERS & OWEN, INC., Defendant-Respondent-Cross-Appellant.

Supreme Court

*No. 95–2928. Oral argument March 3, 1998.—Decided June 19, 1998.*

(Also reported in 579 N.W.2d 217.)

For the plaintiff-appellant-cross respondent petitioner there were briefs by *Richard R. Grant* and *Consigny, Andrews, Hemming & Grant, S.C.*, Janesville and oral argument by *Richard R. Grant.*

For the defendant-respondent-cross appellant there was a brief by *Fred Gants, Lauri D. Morris* and

*Quarles & Brady,* Madison and oral argument by *Fred Gants.*

¶ 1. JON P. WILCOX, J. This is a review of a published decision of the court of appeals, *Tatge v. Chambers & Owen, Inc.,* 210 Wis. 2d 51, 565 N.W.2d 150 (Ct. App. 1997), which affirmed a judgment and an order of the Circuit Court for Rock County, James P. Daley, Judge. The circuit court granted summary judgment in favor of the defendant Chambers & Owen, Inc. (Chambers & Owen) and thereby dismissed the plaintiff Wayne Tatge's (Tatge) claim for wrongful discharge. The circuit court also entered a judgment granting Chambers & Owen's post-verdict motion to dismiss Tatge's claim for negligent misrepresentation.

¶ 2. There are two issues before us on review: (1) whether a cause of action for breach of an employment contract is actionable in tort for misrepresentation under Wisconsin law; and (2) whether the narrow cause of action for wrongful discharge established in *Brockmeyer v. Dun & Bradstreet,* 113 Wis. 2d 561, 335 N.W.2d 834 (1983), encompasses the discharge of an at-will employee for failing to sign a non-disclosure and non-compete agreement. We hold that a breach of an employment contract is not actionable in tort. We also hold that a contract cause of action for wrongful discharge may not be maintained under *Brockmeyer* where an at-will employee is terminated for failing to sign a non-disclosure/non-compete agreement. Accordingly, we affirm the decision of the court of appeals.

¶ 3. The relevant facts are not in dispute. In 1981, Tatge became an employee of Chambers & Owen. In late 1990, Chambers & Owen issued an Employee Handbook to its employees. Tatge signed the Hand-

book receipt on December 18, 1990, whereby he acknowledged that his employment with Chambers & Owen was "at-will, terminable at any time by the company at its sole discretion with or without cause and with or without notice." The receipt further explained that "such employment is not contractual, and remains as such unless and until a written contract expressly authorized by the Board of Directors is entered into and executed in writing by me and Chambers & Owen, Inc. . . ."

¶ 4. In early 1993, after several changes to Tatge's job duties and compensation arrangement, Chambers & Owen asked Tatge to sign a "Management Agreement" (the agreement). Paragraph 1 of the agreement contains a non-disclosure provision that states:

> Employee recognizes and acknowledges that the customer data, programs, and business practices used or employed by Employer embody and involve the use of information of a confidential nature which represents an asset of substantial value. Employee will not, without prior authorization, during or after the term of employment with Employer, disclose such information to any person, firm, corporation, association, or other entity for any reason or purpose whatever.

¶ 5. Paragraph 2 of the agreement contains a covenant not to compete that provides:

> Covenant Not to Compete. Employee shall not, for a period of six (6) months after termination of his/her employment with Employer for any reason whatsoever, with or without cause on behalf of him/herself or any other person, firm, corporation, association, or other entity, directly or indirectly, engage in, assist in, or be connected in any manner with the

sale, distribution, procurement of products or knowledge of those functions competitive with those sold by Employer under this Agreement to any person, firm, corporation, association, or other entity located within the Employers [sic] geographic service area during the six (6) months prior to said termination.

¶ 6. Beginning in April 1993, Tatge expressed his objection to the agreement and discussed it with the company's president, John Owen (Owen). At trial, Tatge testified that he had asked Owen what would happen if Tatge refused to sign the agreement and that Owen replied, "Nothing." Tatge also discussed job security with Owen and testified that Owen told him his employment would be ongoing and terminable only for what amounted to good cause.

¶ 7. At a final meeting on April 5, 1993, after Tatge was given the weekend to "think it over," Tatge again stated that he would not sign the agreement. Tatge told Owen that he had more market value than his current compensation package provided for. Because Tatge would not sign the agreement, Chambers & Owen told Tatge that he would be terminated. That same day, Owen sent a letter to Tatge confirming his dismissal because he would not sign the agreement. The letter stated in pertinent part:

> This letter is intended to confirm our conversation today.
>
> As you know, we have requested our key employees to sign non-competitive agreements. . . .
>
> We have had different conversations on this issue. Today you informed me of your final decision not to sign the agreement. As a result, we are left with no alternative but to terminate your employment. . . .

¶ 8. On April 27, 1994, Tatge commenced suit against Chambers & Owen claiming wrongful discharge, breach of contract and three forms of fraudulent misrepresentation, including negligent, strict liability and intentional misrepresentation.

¶ 9. Both parties moved for summary judgment. On February 17, 1995, the circuit court denied Tatge's motion for partial summary judgment, and dismissed his claim for wrongful discharge. The circuit court reasoned that the agreement did not violate Wisconsin's restrictive covenant statute, Wis. Stat. § 103.465 (1991–92).[1] The circuit court also denied Chambers & Owen's motion to dismiss Tatge's breach of contract and misrepresentation claims, concluding that the latter should be tried only as to the alleged statements that Tatge's employment would be ongoing and that he could only be fired for cause.

¶ 10. The subsequent trial was bifurcated. At the end of the first phase, the jury found insufficient evidence of a contract other than at-will employment, but determined that Chambers & Owen made a representation of fact that Tatge was entitled to ongoing employment and termination only for cause. During

---

[1] All future statutory references are to the 1991–92 version of the statutes unless otherwise noted.

Wisconsin Stat. § 103.465 provides:

**103.465 Restrictive covenants in employment contracts.** A covenant by an assistant, servant or agent not to compete with his employer or principal during the term of the employment or agency, or thereafter, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. Any such restrictive covenant imposing an unreasonable restraint is illegal, void and unenforceable even as to so much of the covenant or performance as would be a reasonable restraint.

the second phase, the circuit court granted Chambers & Owen's motion to dismiss both the intentional and strict liability misrepresentation claims. The circuit court allowed the negligent misrepresentation claim to proceed to trial.

¶ 11. The jury found for Tatge on the negligent misrepresentation claim, assessed his damages at $250,000 and found him 40% contributorily negligent. Upon Chambers & Owen's post-verdict motions for judgment notwithstanding the verdict, to change answers and for directed verdict, the circuit court dismissed Tatge's negligent misrepresentation claim. Tatge appealed.

¶ 12. The court of appeals affirmed the circuit court's order and judgment by concluding: (1) that an employer's discharge of an employee for failing to sign a non-disclosure/non-compete agreement does not give rise to a wrongful discharge claim; and (2) that a breach of an employment contract is not actionable in tort for misrepresentation. On September 18, 1997, we granted Tatge's petition for review.

## I.

¶ 13. The first issue we consider is whether a cause of action for breach of an employment contract is actionable in tort for misrepresentation under Wisconsin law. This presents a question of law which we review de novo, without deference to the conclusions of the circuit court or the court of appeals. *See Kara B. v. Dane County*, 205 Wis. 2d 140, 145–46, 555 N.W.2d 630 (1996).

¶ 14. Before considering the viability of a misrepresentation claim in a breach of contract action, we first shed light on the jury's determination that Tatge's

employment contract was a contract for at-will employment only. As we have stated, the jury found insufficient evidence that Chambers & Owen had entered into a contract with Tatge to provide him with ongoing employment, terminable only for good cause.[2]

¶ 15. Despite the jury's finding, the circuit court allowed the misrepresentation claim to proceed to trial. Then, at the hearing for the post-verdict motions, the circuit court, relying on *Brockmeyer*, stated:

> The jury found that there was no contract. That was the first verdict found that there was no contract for ongoing employment. There was no contract for termination. And based upon that, I believe that ends it as it relates to the termination. As a result, I have, as indicated, dismissed the cause of action.

Record on Appeal at 94:6 (Hearing Transcript August 29, 1995).

¶ 16. Rather than challenge the jury's verdict that he was an employee-at-will, Tatge contests the circuit court's post-verdict grant of judgment notwithstanding the verdict. Accordingly, Tatge argues that misrepresentation by an employer is a valid tort in Wisconsin as presented to and determined by the jury.

---

[2] Specifically, the special verdict form in this case illustrates that the following questions were presented to the jury:

Question 1: Did Chambers & Owen, Inc., enter into a contract to provide Wayne Tatge with ongoing employment?

ANSWER: No.

Question 2: Did Chambers & Owen enter into a contract to provide Wayne Tatge employment with termination only for good cause?

ANSWER: No.

Record on Appeal at 54:1 (Special Verdict June 28, 1995).

More specifically, Tatge argues that Chambers & Owen misrepresented that his employment would be ongoing and terminable only for cause, and that Chambers & Owen thereafter terminated him without cause. Tatge then asks this court to address his misrepresentation claim under tort law—not as a wrongful discharge or breach of contract claim under contract law. He advocates this approach by arguing that employers have an independent duty to their employees to refrain from misrepresentation.

¶ 17. We decline to give our blessing to such an irreverent marriage of tort and contract law. As we explain below, the circuit court was correct to grant Chambers & Owen's motion for judgment notwithstanding the verdict.

¶ 18. "[T]here must be a duty existing independently of the performance of the contract for a cause of action in tort to exist." *Landwehr v. Citizens Trust Co.*, 110 Wis. 2d 716, 723, 329 N.W.2d 411 (1983). We cannot overlook the fact that Tatge's misrepresentation claim finds its lifeline in the improper performance of an employment contract. In other words, Tatge argues that Chambers & Owen's alleged representation that Tatge would be terminable only for good cause tainted his subsequent termination from employment without good cause.

¶ 19. The breach of an employment contract is not actionable in tort. *See Brockmeyer*, 113 Wis. 2d at 574–76 (holding that the breach of an at-will employment contract is not actionable in tort);[3] *Dvorak v.*

---

[3] As the court of appeals stated, "We recognize that Tatge's misrepresentation claim does not depend upon the public policy rationale articulated in *Brockmeyer*." *Tatge v. Chambers & Owen, Inc.*, 210 Wis. 2d 51, 59, 565 N.W.2d 150 (Ct. App. 1997).

107

*Pluswood Wisconsin, Inc.*, 121 Wis. 2d 218, 220, 358 N.W.2d 544 (Ct. App. 1984) (reaching the same conclusion regarding a term employment contract). In this case, no duty to refrain from misrepresentation exists *independently* of the performance of the at-will employment contract. In fact, Tatge's request for damages in this case illustrates that his misrepresentation claim is *dependent* upon his termination from employment: "Plaintiff, but for the misrepresentation, would have changed his position on signing and remained employed, earning $250,000 more in wages and benefits after mitigation." *See* Tatge Brief at 46.[4]

¶ 20. Because it is tied inextricably to his termination from employment, Tatge's misrepresentation claim was properly dismissed by the circuit court.

¶ 21. Tatge cites *Hartwig v. Bitter*, 29 Wis. 2d 653, 139 N.W.2d 644 (1966), for the proposition that employees may maintain a tort claim of misrepresentation against an employer who misrepresents the nature of their employment with the employer. The court of appeals held that *Hartwig* is distinguishable,

---

Nevertheless, a plain reading of *Brockmeyer* illustrates that any claim which is dependent upon a wrongful termination from at-will employment is not actionable in tort. *See generally Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 335 N.W.2d 834 (1983).

[4] We do not mean to suggest that litigants may circumvent the holding of this court simply by pleading damages which somehow do not arise solely from one's termination of employment. As we have said, a duty must exist independently from the performance of the employment contract in order to maintain a cause of action in tort. *See Landwehr v. Citizens Trust Co.*, 110 Wis. 2d 716, 723, 329 N.W.2d 411 (1983). The discussion regarding Tatge's asserted damages is relevant only to make clear that his tort claim is dependent upon his termination from employment.

*see Tatge*, 210 Wis. 2d at 58–59, and we agree. In *Hartwig*, the employer persuaded two real estate agents to work for him by misrepresenting, among other things, that he had a list of "prospects" who were interested in buying or selling business enterprises; that the agents would earn a lot of money by selling to these "prospects"; and that he, the employer, was closing sales "right along." *See Hartwig*, 29 Wis. 2d at 655.

¶ 22. When the agents brought suit against the employer, alleging that they were damaged by the employer's misrepresentations, the employer moved to dismiss the complaint by arguing that the facts alleged did not constitute a cause of action. *See id.* at 655–56. We held that a viable cause of action for misrepresentation had been pleaded. *See id.* at 658–59.

¶ 23. As the court of appeals noted, the agents were not employees at the time of the misrepresentation. *See Tatge*, 210 Wis. 2d at 59. Because no employment relationship existed at the time of the misrepresentations, any duty to refrain from misrepresentation must have existed independently from the performance of an employment contract. Therefore, *Hartwig* is inapposite,[5] and we are left with

---

[5] Tatge's attempt to utilize *Hausman v. St. Croix Care Center, Inc.*, 207 Wis. 2d 402, 558 N.W.2d 893 (Ct. App. 1996), *rev'd* 214 Wis. 2d 654, 571 N.W.2d 393 (1997), and *Wausau Medical Center, S.C. v. Asplund*, 182 Wis. 2d 274, 514 N.W.2d 34 (Ct. App. 1994) is no more persuasive. Although the court of appeals in *Hausman* briefly "entertained" the employees' misrepresentation claim against their employer, the alleged misrepresentation was not dependent upon a breach of their employment contract. Rather, the employees claimed that they would have been statutorily protected from termination had the employer not made the misrepresentation. *See Hausman*, 207 Wis. 2d at 410–11.

but one issue for our determination: whether Tatge has a viable contract cause of action for wrongful discharge in accordance with our decision in *Brockmeyer*.

## II.

¶ 24. We next consider whether the narrow cause of action for wrongful discharge established in *Brockmeyer* encompasses the discharge of an at-will employee for failing to sign a non-disclosure/non-compete agreement. Our consideration of this issue requires us to determine whether as a matter of law, Tatge has identified a fundamental and well-defined public policy in Wis. Stat. § 103.465 so as to trigger the *Brockmeyer* exception to the employment-at-will doctrine. Thus, we are presented with a question of law which this court reviews de novo, without deference to the conclusions of the circuit court or the court of appeals. *See Kempfer v. Automated Finishing, Inc.*, 211 Wis. 2d 100, 107–08, 564 N.W.2d 692 (1997); *Brockmeyer*, 113 Wis. 2d at 574. In addition, we review the circuit court's summary judgment ruling on this question de novo, and apply the same methodology as the circuit court. *See Wisconsin Dep't of Corrections v. Kliesmet*, 211 Wis. 2d 254, 259, 564 N.W.2d 742 (1997).

---

In *Wausau Medical*, the alleged misrepresentation, as in *Hartwig*, occurred at a time when no employment relationship existed between the parties—that is, the misrepresentation induced the employee to enter into the employment relationship. *See Wausau Medical*, 182 Wis. 2d at 290–91. For a discussion of such "truth-in-hiring" claims, see Sandra J. Mullings, *Truth-in-Hiring Claims and the At-Will Rule: Should an Employer Have a License to Lie?*, 1997 Colum. Bus. L. Rev. 105, 131 (concluding that "the right to terminate employment at will is not a license to lie in order to bring about that employment.").

## A.

¶ 25. Before addressing the *Brockmeyer* public policy exception to employment-at-will, we first respond to Chambers & Owen's argument that Tatge's claim should fail because Wis. Stat. § 103.465 is inapplicable to the facts of this case. This argument is based on the following exchange between the parties.

¶ 26. Tatge asserts that the non-disclosure provision (paragraph 1 of the agreement)—not the non-compete provision (paragraph 2)—is unreasonable within the meaning of Wis. Stat. § 103.465. In particular, Tatge contends that since there are no time or geographic limitations set forth in the non-disclosure paragraph, the non-disclosure provision is an unreasonable restraint of trade under § 103.465 and this court's decision in *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis. 2d 202, 267 N.W.2d 242 (1978).

¶ 27. Chambers & Owen responds by arguing that Wis. Stat. § 103.465 does not apply to non-disclosure provisions, but "by its terms" applies only to covenants not to compete. Because § 103.465 is inapposite, Chambers & Owen asserts that a *Brockmeyer* wrongful discharge claim may not be sustained by relying on public policy evidenced by that statute. We disagree.

¶ 28. Leaving aside the question whether the non-disclosure provision satisfies the commands of Wis. Stat. § 103.465,[6] we conclude that § 103.465 applies to the non-disclosure provision in this case. We

---

[6] Because we conclude that Tatge has not identified a fundamental and well-defined public policy in Wis. Stat. § 103.465 sufficient to trigger the *Brockmeyer* exception to employment-at-will, we need not determine whether the non-disclosure provision is indeed unreasonable.

need look no further than *Van Zeeland* to reach this conclusion. The *Van Zeeland* court applied § 103.465 to a non-disclosure agreement containing virtually the same language as the paragraph involved here, *see Van Zeeland*, 84 Wis. 2d at 208, 218–220, because "[i]t is apparent that what [the employer] seeks in this action is the restraint of competition. . . ." *Id.* at 209.

¶ 29. As in *Van Zeeland*, it is clear that Chambers & Owen seeks to restrain competition through use of the non-disclosure provision. It seeks to shield its customer data, programs, and business practices from competitors' eyes because it "represents an asset of substantial value." This is the essence of a trade restraint; it would be an exercise in semantics to overlook Wis. Stat. § 103.465 merely because paragraph 1 of the agreement is not labeled a "covenant not to compete." Therefore, we proceed to analyze Tatge's wrongful discharge claim under *Brockmeyer*.

### B.

¶ 30. In *Brockmeyer*, we traced the history and evolution of the employment-at-will doctrine. *Brockmeyer*, 113 Wis. 2d at 566–68. We need not repeat that discussion here; Wisconsin first recognized the doctrine in *Prentiss v. Ledyard*, 28 Wis. 131, 133 (1871), and it is now a stable fixture in Wisconsin law. *See, e.g., Hausman v. St. Croix Care Center, Inc.*, 214 Wis. 2d 654, 662, 571 N.W.2d 393 (1997) ("The employment-at-will doctrine is an established general tenet of workplace relations in this jurisdiction."). The employment-at-will doctrine dictates that where employment is for an indefinite term, an employer may discharge an employee "for good cause, for no cause, or even for cause morally wrong, without being thereby guilty of

legal wrong." *Brockmeyer*, 113 Wis. 2d at 567 (internal quotation marks and citations omitted).

¶ 31. Despite statutory modification of the at-will doctrine "to curb harsh applications and abuse of the rule," we recognized, as have other state courts, "the need to protect workers who are wrongfully discharged under circumstances not covered by any legislation or whose job security is not safeguarded by a collective bargaining agreement or civil service regulations." *Brockmeyer*, 113 Wis. 2d at 567–68. Therefore, we adopted a "narrow public policy exception" to the employment-at-will doctrine. That exception provides that "an employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law." *Id.* at 572–73.[7]

¶ 32. We have since modified the public policy exception to the employment-at-will doctrine in several ways. In *Wandry v. Bull's Eye Credit Union*, 129 Wis. 2d 37, 46–47, 384 N.W.2d 325 (1986), we extended *Brockmeyer*'s wrongful discharge rule to include the spirit, as well as the letter of a statutory provision. *See also Schultz v. Production Stamping*, 148 Wis. 2d 17, 22, 434 N.W.2d 780 (1989); *Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 143–44, 396 N.W.2d 167 (1986). In *Bushko*, we expressly limited the scope of the public policy exception to situations where the employee is terminated for refusing a command, instruction, or request of the employer to violate public policy as

---

[7] "Existing law" was originally limited to constitutional or statutory provisions, *see Brockmeyer*, 113 Wis. 2d at 576, but has since been expanded to include administrative rules. *See generally Winkelman v. Beloit Memorial Hosp.*, 168 Wis. 2d 12, 483 N.W.2d 211 (1992).

established by existing law. *See Bushko*, 134 Wis. 2d at 142; *see also Kempfer*, 211 Wis. 2d at 110–111, 115.

¶ 33. Finally, we recently expanded the public policy exception to include situations where an employee is terminated for his or her compliance with an affirmative obligation under law. *See Hausman*, 214 Wis. 2d at 668. In *Hausman* we stated:

> Where the law imposes an affirmative obligation upon an employee to prevent abuse or neglect of nursing home residents and the employee fulfills that obligation by reporting the abuse, an employer's termination of employment for fulfillment of the legal obligation exposes the employer to a wrongful termination action. In such instances, the employee may pursue a wrongful termination suit under the public policy exception regardless of whether the employer has made an initial request, command, or instruction that the reporting obligation be violated.

*Id.*

### C.

¶ 34. Citing several of these cases, Tatge argues that Wis. Stat. § 103.465 articulates a fundamental and well-defined public policy that unreasonable restraints of trade will not be placed upon employees. According to Tatge, the nature of this public policy is evidenced by three cases: *Streiff v. American Family Mut. Ins. Co.*, 118 Wis. 2d 602, 348 N.W.2d 505 (1984); *Van Zeeland*, 84 Wis. 2d 202; and *General Medical Corp. v. Kobs*, 179 Wis. 2d 422, 507 N.W.2d 381 (Ct. App. 1993).

¶ 35. We need not address these cases in detail because we agree that Wis. Stat. § 103.465 evidences a

strong public policy against the enforcement of trade restraints which are determined to be unreasonable upon all employees, including those employed at will. We do not agree, however, that § 103.465 evidences a public policy contrary to an employer's requirement that its employee *sign* a non-disclosure/non-compete agreement which that employee *considers* to be unreasonable within the meaning of § 103.465.[8] None of these cases illustrate, or even suggest, that such a policy is evidenced by the statute.

¶ 36. We have often repeated that the *Brockmeyer* public policy exception to the employment-at-will doctrine is a narrow one. *See, e.g., Kempfer*, 211 Wis. 2d at 113 ("Thus, the Wisconsin public policy exception to the employee-at-will doctrine is very narrow."); *Bushko*, 134 Wis. 2d at 146 ("The public policy exception of *Brockmeyer* must be reflected clearly in existing law. . . ."); *Brockmeyer*, 113 Wis. 2d at 578–79 (illustrating that a statute must contain a "clearly defined mandate of public policy against discharging an employee" for engaging in the employer-proscribed conduct). A plain reading of Wis. Stat. § 103.465 reveals that Tatge has not identified such a clear and well-defined public policy.

¶ 37. The statute states that covenants not to compete are "lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal." Wis. Stat. § 103.465. It then indicates that "[a]ny such restrictive covenant imposing an unreasonable restraint is *illegal,*

---

[8] This is the practical effect of Tatge's argument that Wis. Stat. § 103.465 prohibits the "imposition" of an unreasonable restrictive covenant. According to Tatge, the "imposition" of a restrictive covenant occurs "at the time that [Tatge] signs it." Oral argument transcript.

*void and unenforceable* even as to so much of the covenant or performance as would be a reasonable restraint." *Id.* (emphasis added).

¶ 38. The clear public policy manifested by Wis. Stat. § 103.465 is to protect the employee from compliance with the terms of an "unreasonable" restrictive covenant by rendering that covenant void and unenforceable. As the court of appeals stated, "[w]hen a restrictive covenant is unreasonable, the public policy of Wisconsin is not to create a cause of action, but to void the covenant." *Tatge*, 210 Wis. 2d at 57. The public policy remains the same regardless of whether the agreement is reasonable within the meaning of § 103.465. Therefore, although § 103.465 evinces clear public policy for this jurisdiction, Tatge has not identified a fundamental and well-defined public policy sufficient to trigger the *Brockmeyer* exception to employment-at-will.[9]

■■

¶ 39. Neither the spirit nor the letter of Wis. Stat. § 103.465 establishes a well-defined public policy in Wisconsin against an employee's signing a covenant not to compete that he or she presumes to be unreasonable—and with good reason. We have previously held that the validity of a restrictive covenant is to be estab-

---

[9] The dissent's position is perplexing. According to the dissent, an employer enforces a non-disclosure agreement when the employer terminates its employee for failing to sign that agreement. *See* Dissent at 123–24. Ordinarily, one would assume that enforcement of a non-disclosure agreement could only occur after: (1) the parties actually agreed to its terms; (2) the employee sought to disclose allegedly confidential information; and (3) the employer attempted to prevent the disclosure of that information by calling upon the agreement. The dissent's reasoning to the contrary is unfounded.

lished by examination of the particular circumstances which surround it. *See Rollins Burdick Hunter of Wisconsin, Inc. v. Hamilton,* 101 Wis. 2d 460, 468, 304 N.W.2d 752 (1981) ("[W]hat is reasonable varies from case to case, and what may be unreasonable in one instance may be very reasonable in another.").

¶ 40. In *Rollins,* we made clear that the task of determining the "reasonableness" of a restrictive covenant within the meaning of Wis. Stat. § 103.465 is not to be undertaken without a thorough examination of the facts of each individual case. In particular, we noted that the following factors would have to be considered in order to make such a determination: (1) the extent to which the information sought to be protected is vital to the employer's ability to conduct its business; (2) the extent to which the employee actually had access to that information; and (3) the extent to which such information could be obtained through other sources. *See id.* at 470.

¶ 41. We also stated:

> As to whether the restraint is unreasonable to the employee, we do not see how such a determination could be made without considering additionally the extent to which the restraint on competition actually inhibits the employee's ability to pursue a livelihood in that enterprise, as well as the particular skills, abilities, and experience of the employee sought to be restrained. These, of course, are not exhaustive, since the very essence of what is reasonable involves the totality of the circumstances.

*Id.*

¶ 42. Were we to apply the *Brockmeyer* exception to the facts of this case, at-will employees could indiscriminately decline to sign non-disclosure/non-compete

agreements which in their own minds are "unreasonable," and subsequently bring a wrongful discharge claim if terminated for doing so.[10] As the court of appeals stated, "all restrictive covenant cases would become wrongful discharge cases." *Tatge*, 210 Wis. 2d at 56–57. Not surprisingly, Wis. Stat. § 103.465 is devoid of any suggestion that the legislature intended such an anomalous result.

¶ 43. Once the wrongful discharge claim is filed, Tatge's approach would base the claim on hypothetical facts, before an employer has even sought to enforce the allegedly unreasonable agreement. Courts would be required to engage in fact-intensive inquiries to determine whether an employer has a protectable interest and whether it is reasonable as to the employee without actual facts regarding the specific information sought to be protected, the length of employment and the nature of the competition.

¶ 44. We decline to adopt such a dubious and unpredictable approach, regardless of whether the agreement was enforceable. Therefore, we hold that Tatge has not identified a fundamental and well-defined public policy in Wis. Stat. § 103.465 sufficient

---

[10] At-will employees might even refuse to sign non-disclosure/non-compete agreements in bad faith, or when motivated by purely self-serving desires. For example, an at-will employee who is terminated for refusing to sign a non-disclosure/non-compete agreement under the guise that it is "unreasonable" within the meaning of Wis. Stat. § 103.465, but who truthfully intended to use the agreement as a bargaining tool for obtaining a pay increase or other work-related benefits could maintain a wrongful discharge action against the employer. We decline to promote such disingenuous tactics.

to trigger the *Brockmeyer* exception to employment-at-will.[11]

### D.

¶ 45. Our decisions in *Hausman, Kempfer* and *Wandry* are consistent with the conclusion we reach today. In *Hausman*, we determined that Wis. Stat. § 940.295(3) (1993–94) evidences a strong public policy of protecting nursing home residents, such that the narrow *Brockmeyer* exception should be expanded to include an employee's actions which comply with an affirmative obligation to act to prevent suspected abuse or neglect of nursing home residents. *See Hausman*, 214 Wis. 2d at 665–67.

¶ 46. Wisconsin Stat. § 940.295(3) (1993–94) states clearly that persons who "knowingly permit[ ] another person to" intentionally or recklessly abuse or neglect a patient/resident of a nursing home would be guilty of up to a Class D felony for their failure to act.

---

[11] In concluding that Wis. Stat. § 103.465 evinces a *Brockmeyer*-worthy public policy exception to employment-at-will, the dissent spends most of its time discussing the injustices produced when employees are compelled by the hand of "superior bargaining power" to shoulder the burden of "ominous covenants" which "loom over the employee" and have an "*in terrorem* effect." *See generally* Dissent. *See also Streiff v. American Family Mut. Ins. Co.*, 118 Wis. 2d 602, 614, 348 N.W.2d 505 (1984). In our assessment, this ignores the real issue presented for our review: does § 103.465 evidence a clear and well-defined public policy contrary to an employer's requirement that its employee sign a non-disclosure/non-compete agreement? We reject the dissent's approach, which apparently would extend the narrow *Brockmeyer* exception to all situations which ring of some perceived unfairness, even if the statute says nothing about it.

*See* § 940.295(3) (1993–94) (quoted in *Hausman,* 214 Wis. 2d at 658–59 n.3). We therefore concluded that employers who terminated their employees for fulfilling their legal obligation would expose themselves to a wrongful discharge suit. *See Hausman,* 214 Wis. 2d at 668. We are presented with no affirmative legal obligation in this case.

¶ 47. *Kempfer* also provides a clear example of a statutory statement of public policy that is sufficient to trigger the *Brockmeyer* exception to employment-at-will. In that case, Kempfer's employer asked him to drive a truck with full knowledge that Kempfer did not have the required license. *See Kempfer,* 211 Wis. 2d at 106–107. The applicable statute, Wis. Stat. § 343.05(2)(a) (1993–94), provided that no person may operate a commercial motor vehicle upon the state's highways unless the person has a valid commercial driver's license. *See id.* at 113 n.2.

¶ 48. We held that Kempfer had identified a public policy to promote highway safety through the use of regulations and penalties—a policy so fundamental and well-established as to trigger the *Brockmeyer* exception to employment-at-will. *See id.* at 113–14. We are not presented with such a clear statement of public policy in this case.

¶ 49. In *Wandry,* we held that Wis. Stat. § 103.455 (1983–84) "articulates a fundamental and well-defined public policy proscribing economic coercion by an employer upon an employee to bear the burden of a work-related loss when the employee has no opportunity to show that the loss was not caused by the employee's carelessness, negligence, or wilful misconduct." *Wandry,* 129 Wis. 2d at 47. Citing similar language between Wis. Stat. § 103.465 and Wis. Stat. § 103.455 (1983–84), Tatge argues that *Wandry*'s inter-

pretation of the latter statute commands a different result in this case.[12]

¶ 50. Specifically, Tatge cites the language which provided, "[a]ny agreement entered into by employer and employee contrary to this section shall be void and of no force and effect." Wis. Stat. § 103.455 (1983–84). According to Tatge, if the public policy of Wis. Stat. § 103.465 is merely to void the covenant, so too must the public policy of Wis. Stat. § 103.455 (1983–84) be to void the agreement—a result directly at odds with our holding in *Wandry*. We disagree.

¶ 51. Wisconsin Stat. § 103.455 (1983–84) contained a clear expression of public policy by explicitly barring an employer from making deductions from its employee's wages unless certain conditions had been met. As an additional statement of public policy, the statute indicates that any agreement which contravenes that command would be void. In this case, the sole expression of public policy revealed by Wis. Stat. § 103.465 is to render void and unenforceable an unreasonable restrictive covenant. There is no clear expression of public policy which explicitly bars an

---

[12] The statute at issue in *Wandry* provided in pertinent part:

**103.455 Deductions for Faulty Workmanship, Loss, Theft or Damage:** No employer shall make any deductions from the wages due or earned by any employee. . .for defective or faulty workmanship, lost or stolen property or damage to property, unless the employee authorizes the employer in writing to make such deductions or unless the employer and a representative designated by the employee shall determine that such defective or faulty work, loss or theft, or damages are due to the worker's negligence, carelessness, or wilful and intentional conduct on the part of such employee. . . . Any agreement entered into by employer and employee contrary to this section shall be void and of no force and effect. . . .

employer's practice of requiring its employees to sign allegedly unreasonable restrictive covenants.

### E.

¶ 52. Finally, we note briefly that our decision is also consistent with the conclusion reached by the Vermont Supreme Court in a nearly identical case. *See Madden v. Omega Optical, Inc.*, 683 A.2d 386 (Vt. 1996). In *Madden,* the plaintiffs refused to sign a Confidentiality, Disclosure, and Noncompetition Agreement and were terminated as a result. *See id.* at 388. In their subsequent suit for breach of contract, wrongful discharge, and promissory estoppel, the plaintiffs argued in part that their termination for refusing to sign the agreement constituted a wrongful discharge in violation of public policy. *See id.* at 391.

¶ 53. The Vermont Supreme Court held that, regardless of whether the agreement was enforceable, the plaintiffs' termination for refusing to sign it did not violate public policy.[13] *See id.* In reaching this conclusion, the court noted that "[i]f the Agreement is unenforceable, plaintiffs took no risk by signing it because they could later challenge the Agreement when defendant sought to enforce it." *Id.*

¶ 54. The same reasoning applies here. Tatge gambles little by signing the agreement; in the event that Chambers & Owen later sought to enforce the agreement, Tatge could challenge it as unenforceable at that time. Upon such a challenge, Wis. Stat. § 103.465 imposes a heavy burden on the employer who

---

[13] The Vermont Supreme Court's decision was based not upon principles of public policy evidenced by statutory or constitutional law, but upon general and societal notions of public policy. *See Madden v. Omega Optical, Inc.*, 683 A.2d 386, 391 (Vt. 1996).

seeks to enforce a covenant not to compete. The statute renders the entire covenant void if any portion of it is deemed "unreasonable." *See* Wis. Stat. § 103.465; *see generally* George A. Richards, *Drafting and Enforcing Restrictive Covenants Not to Compete*, 55 Marq. L. Rev. 241 (1972). This burden was specifically imposed so that "employers possessing bargaining power superior to that of the employees" would not be encouraged "to insist upon unreasonable and excessive restrictions, secure in the knowledge that the promise will be upheld in part, if not in full." *Streiff*, 118 Wis. 2d at 608–609.

### III.

¶ 55. Because the breach of an employment contract is not actionable in tort, Tatge's claim for misrepresentation fails as a matter of law. Furthermore, since Tatge has not identified a fundamental and well-defined public policy in Wis. Stat. § 103.465 sufficient to trigger the *Brockmeyer* exception to employment-at-will, there remains no genuine issue of fact for trial, and summary judgment was properly granted on his claim for wrongful discharge.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 56. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE (*dissenting*). Under the majority opinion, Wisconsin employers are now free to present the following ultimatum to their at-will employees: sign a nondisclosure agreement (regardless of its legality), or you're fired. I conclude that the court should recognize the right of an employee-at-will who claims that a non-

disclosure agreement is void under Wis. Stat. § 103.465 to sue for wrongful discharge. For the reasons set forth, I dissent.

¶ 57. I agree with the majority opinion that "§ 103.465 evidences a strong public policy against the enforcement" of unreasonable trade restraints, majority op. at 114–15, and that § 103.465 is applicable to the nondisclosure clause in this case. Majority op. at 111–112. What the majority opinion fails to see, however, is that when an employer terminates an at-will employee for refusing to sign an illegal nondisclosure agreement, the employer *is enforcing* the illegal agreement.

¶ 58. Contrary to the majority opinion's assertion, enforcement of a nondisclosure agreement does not start when an employer attempts to prevent an employee from violating the agreement. Rather enforcement of a nondisclosure agreement starts when an employee is asked to sign the agreement. The language and the legislative history of Wis. Stat. § 103.465 make clear that § 103.465 was designed to govern the employer and employee in entering a covenant not to compete. The language of the statute refers to covenants governing the duration of employment and thereafter.

¶ 59. The drafting record of Wis. Stat. § 103.465 includes a letter by Representative Richard E. Peterson of Waupaca County to the legislative reference library giving drafting instructions for § 103.465. Representative Peterson explained that he wanted a bill drafted to reverse *Fullerton Lumber Co. v. Torberg*, 270 Wis. 133, 70 N.W.2d 585 (1955), in which the court enforced the reasonable aspects of an invalid covenant not to compete. Representative Peterson explained his concerns about *Fullerton* as follows: "[a]t the time the

contract was entered into, the bargaining position of the two contractors appears to me to be relatively unequal in that the party seeking employment must, if he desires employment with the contracting party, consent to almost any restrictive covenant imposed. The effect [of the *Fullerton* decision] is to give to the employer complete latitude" in setting forth the terms of the agreement, including the geographical and time limits imposed.[1]

¶ 60. Representative Peterson wanted the bill drafted to put the two contracting parties in more equal bargaining positions and to avoid giving "a green light" to employers in writing agreements not to compete.[2] The reasoning and result of the majority opinion are contrary to the legislative purpose of Wis. Stat. § 103.465.

¶ 61. With this background, I turn to the facts of this case.

## I

¶ 62. One implication of the majority opinion is that the nondisclosure agreement in this case is void and hence illegal. The majority opinion concedes that the nondisclosure provision drafted by the employer in this case "contains virtually the same language," majority op. at 111–12, as the nondisclosure agreement

---

[1] *See* Representative Richard Peterson's letter to Mr. M.G. Toepel, Legislative Reference Library, Feb. 26, 1957, in Legislative Drafting File, Wis. Stat. § 103.465; Stewart Macaulay, Supplementary Comments in Richard Danzig, The Capability Problem in Contract Law: Further Readings on Well-Known Cases, at 61 (1978).

[2] *See* Representative Richard Peterson's letter to Mr. M. G. Toepel, Legislative Reference Library, Feb. 26, 1957, in Legislative Drafting File, Wis. Stat. § 103.465.

in *Gary Van Zeeland Talent, Inc. v. Sandas*, 84 Wis. 2d 202, 267 N.W.2d 242 (1978). The *Van Zeeland* court struck down the nondisclosure agreement under Wis. Stat. § 103.465 because it contained no geographic or time limits. *See Van Zeeland*, 84 Wis. 2d at 218.

¶ 63. The nondisclosure agreement in this case, like the nondisclosure agreement in *Van Zeeland*, is unreasonable and void under Wis. Stat. § 103.465. But under the majority opinion, employers may force at-will employees to sign such illegal nondisclosure agreements under threat of termination of employment. Thus the majority opinion "tends to encourage employers possessing bargaining power superior to that of the employees to insist upon unreasonable and excessive restrictions." *Streiff v. American Family Mut. Ins. Co.*, 118 Wis. 2d 602, 608–09, 348 N.W.2d 505 (1984). I know of no court, other than the court of appeals in this case, that has condoned the signing of an illegal nondisclosure agreement.

¶ 64. Although the nondisclosure agreement in this case appears to be illegal, in many instances the validity of a nondisclosure agreement is uncertain until a court makes a determination.[3] Under the majority opinion an at-will employee who is uncertain about whether an agreement is legal has only one way to test the validity of the agreement: sign the agreement, breach the agreement, and wait until the employer sues to enforce it. This method is not risk-free as an employee may be liable in damages for breaching

---

[3] Even in this case there may be some doubt about the legality of the nondisclosure agreement. Some commentators have criticized the reasoning of the *Van Zeeland* court, arguing that imposing territorial or time limits defeats the purpose of nondisclosure agreements. *See* III State Bar of Wis., *Wis. Employment Law*, § 15.75, at 15–78 to 15–79 (1994).

the agreement should a court later find the nondisclosure agreement to be valid.

¶ 65. Under the majority opinion, if an employee refuses to sign the agreement (regardless of its legality), the employee can be discharged. If an employee brings a declaratory judgment action to determine the validity of the agreement, the employee can be discharged.

## II

¶ 66. The majority opinion puts employers in a win-win situation. If an employee refuses to sign a nondisclosure agreement (even if it is illegal), the employer can discharge the employee without liability for wrongful discharge. If the employee signs the agreement, the terms of the agreement loom over the employee both during the course of employment and afterwards.

¶ 67. The majority opinion justifies its holding by claiming that an employee "gambles little by signing the agreement." Majority op. at 122–23. What the majority opinion fails to recognize is that an employee presented with a nondisclosure agreement (regardless of its legality), incurs significant risks by refusing to sign or by signing the agreement. Representative Peterson apparently understood these facts of life when he proposed Wis. Stat. § 103.465.

¶ 68. An employee presented with a nondisclosure agreement is forced into a lose-lose situation. If the employee refuses to sign the agreement, the employee risks termination without any right to sue for wrongful discharge. If the employee signs the agreement, the employee risks a lawsuit and litigation expenses when he or she chooses to violate the agreement. Alternatively, the employee who signs the agreement may feel compelled to respect his or her

contractual obligations (regardless of the legality of the agreement), thereby forgoing other employment opportunities in order to avoid litigation expenses. Moreover, prospective employers may refuse to hire an employee who has signed a nondisclosure agreement, regardless of their assessment of the legality of the agreement, for fear of buying themselves a lawsuit.[4]

¶ 69. As this court has recognized, "[a] principal argument against giving effect to reasonable aspects of a restraint is that the employer can fashion ominous covenants which affect the mobility of employees because of their *in terrorem* effect on employees who respect contractual obligations and their effect on competitors who do not wish to risk legal difficulties." *Streiff*, 118 Wis. 2d at 614 (citing Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 682 (1960)). The *Streiff* decision relied on the legislative history of Wis. Stat. § 103.465, including Representative Peterson's letter. The majority opinion ignores this legislative history.

¶ 70. The majority opinion places all the risk on an employee when an employer asks the employee to sign a nondisclosure agreement even though the employer has drafted the agreement and has the superior bargaining power. It seems to me that the fairness considerations set forth in the language and legislative history of Wis. Stat. § 103.465 require that some of the risks relating to the legality of the agreement should be placed on the employer who drafted the agreement and seeks to impose it. Ensuring that the employer and the employee share the risk comports with the legislature's

---

[4] *See General Med. Corp. v. Kobs*, 179 Wis. 2d 422, 425, 507 N.W.2d 381 (Ct. App. 1993) (plaintiff alleged tortious interference against competitor that hired ex-employee to work in violation of terms of restrictive covenant).

instruction "as to the equities between the parties." *Streiff*, 118 Wis. 2d at 614.

¶ 71. Thus I conclude that the public policy of this state as reflected in Wis. Stat. § 103.465 requires that an employer who terminates employment of an at-will employee based on the employee's refusal to sign a nondisclosure agreement is liable for wrongful discharge if a court decides the agreement is void.

¶ 72. For the foregoing reasons, I dissent.

¶ 73. I am authorized to state that Justice Ann Walsh Bradley joins this dissent.