Jerold J. MACKENZIE, Plaintiff-Respondent-Cross-
Appellant-Petitioner,

v.

MILLER BREWING COMPANY and Robert L. Smith,
Defendants-Appellants-Cross-Respondents,

Patricia G. BEST, Defendant-Cross-Respondent.

Supreme Court

*No. 97–3542. Oral argument November 28, 2000.—Decided
March 20, 2001.*

2001 WI 23

(Also reported in 623 N.W.2d 739.)

701

For the plaintiff-respondent-cross appellant-petitioner there were briefs by *Michael A. Whitcomb* and *Michael A.I. Whitcomb, S.C.*, Milwaukee, and *Gerald P. Boyle* and *Boyle, Boyle & Smith, S.C.*, Milwaukee,

and oral argument by *Michael A. Whitcomb* and *Gerald P. Boyle.*

For the defendants-appellants-cross respondents and for the defendant-cross respondent there was a brief by *Mary Pat Ninneman, John A. Casey, Frank J. Daily* and *Quarles & Brady LLP,* Milwaukee, and oral argument by *John A. Casey* and *Frank J. Daily.*

An amicus curiae brief was filed by *C. Gregory Stewart, Philip B. Sklover, Lorraine C. Davis and Robert J. Gregory,* Washington, D.C., and *Dennis R. McBride,* Milwaukee, on behalf of the Equal Employment Opportunity Commission.

An amicus curiae brief was filed by *Patrick O. Dunphy, Mark L. Thomsen* and *Cannon & Dunphy, S. C.,* Brookfield, on behalf of the Wisconsin Academy of Trial Lawyers.

An amicus curiae brief was filed by *Lisa M. Bergersen, Bethany C. McCurdy* and *Lindner & Marsack, S. C.,* Milwaukee, on behalf of the Human Resources Management Association (HRMA).

An amicus curiae brief was filed by *Donald L. Heaney, Kenneth B. Axe* and *Lathrop & Clark,* Madison, on behalf of Wisconsin Manufacturers and Commerce.

¶ 1. JON P. WILCOX, J. The question in this case is whether an at-will contract employee can maintain an action against his or her employer in tort for intentional misrepresentation to induce continued employment. Because we believe that it would be imprudent for this court to recognize such a cause of action at this time, we conclude that those who are party to an at-will contract must seek recourse in contract rather than tort law.

¶ 2. The plaintiff in this case, Jerold J. Mackenzie (Mackenzie), sued Miller Brewing Company (Miller) in tort for intentional misrepresentation and wrongful termination.[1] Mackenzie also sued his supervisor, Robert L. Smith (Smith), in tort for intentional misrepresentation and tortious interference with prospective contract.[2] Finally, Mackenzie sued a coworker, Patricia G. Best (Best), for tortious interference with contract. After a jury trial in the Circuit Court for Milwaukee County, Louise M. Tesmer, Judge, Mackenzie was awarded $24,703,000 against Smith and Miller.[3] The court of appeals overturned the circuit court decision. For the reasons set forth below, we now affirm the court of appeals ruling.

## I

¶ 3. Mackenzie was hired by Miller in 1974 as an area manager of Miller distributors with a salary grade level of 7.[4] In 1982 he had progressed to grade level 14, and he attained the position of Sales Services and Development Manager reporting to Smith in 1987. In late 1987 Miller undertook a corporate reorganization, which led to a transfer of many of Mackenzie's respon-

---

[1] The circuit court dismissed the wrongful termination claim against Miller at summary judgment. Mackenzie does not contest that ruling before this court.

[2] Mackenzie has not raised the claim of tortious interference with prospective contract before this court.

[3] The jury awarded Mackenzie $1,500,000 in punitive damages against Best, but the circuit judge dismissed the award because the jury failed to award Mackenzie any compensatory damages against Best.

[4] Miller utilizes a grade level system that classifies each position according to responsibilities and corresponding salary range and benefits.

sibilities. Concerned, Mackenzie asked Smith whether the reorganization affected his grade level. Smith responded that it did not. In 1989 Miller reevaluated the grade levels of 716 positions, including Mackenzie's. As a result, Mackenzie's position was downgraded to grade level 13. The reevaluation, however, was prospective and applied to the position, not the employee. Therefore, Mackenzie was grandfathered as a grade level 14, even though his position was a grade level 13. That same year, Mackenzie's secretary, Linda Braun, made a sexual harassment complaint against him. She made another sexual harassment complaint against him in 1990.

¶ 4. In August of 1992 Miller sent a memo to employees whose positions had been downgraded but who had been grandfathered to their current grade level informing them that they would be downgraded to their position grade level. Therefore, as of January 1, 1993, Mackenzie would be at grade level 13. He would receive the same salary and benefits of a grade level 14, but he would not be entitled to any future grants of stock options.

¶ 5. On March 23, 1993, Best, a Miller distributor services manager who had previously reported to Mackenzie, told her supervisor, Dave Goulet, that Mackenzie had told her about a sexually suggestive episode of the "Seinfeld" television show, which made her uncomfortable. Miller immediately investigated the matter and Mackenzie denied sexually harassing Best. After concluding its investigation, Miller discharged Mackenzie for "exercising poor judgment."

¶ 6. Mackenzie subsequently commenced this suit on September 29, 1994. He alleged four causes of action in tort against Miller, Smith, and Best: (1) intentional misrepresentation against Smith and Miller; (2)

tortious interference with prospective contract against Smith; (3) tortious interference with contract against Best; and (4) wrongful termination against Miller. His theory supporting the intentional misrepresentation torts against Smith and Miller was that Miller had a duty to disclose after the 1987 reorganization that his position had been grandfathered and that Smith misrepresented to Mackenzie that he would not be affected by the reorganization. In support of the tortious interference claim against Best, he contended that she improperly induced Miller to terminate Mackenzie by fraudulently misrepresenting to Miller that she felt harassed by his discussion of the Seinfeld program. The circuit court denied the defendants' motion to dismiss.

¶ 7.　However, the circuit court did grant Miller's motion for summary judgment as to the wrongful termination claim, but allowed Mackenzie's three remaining claims to survive. On June 23, 1997, a jury trial began and resulted in a verdict three weeks later. The jury awarded $6,501,500 in compensatory damages and $18,000,000 in punitive damages against Miller on the intentional misrepresentation claim. The jury also awarded $1,500 in compensatory damages and $500,000 in punitive damages against Smith on the same tort. The jury found Smith liable for tortious interference with Mackenzie's promotion and awarded him compensatory damages of $100,000. Finally, the jury failed to award Mackenzie any compensatory damages for tortious interference with contract against Best, but did award him $1,500,000 in punitive damages. The circuit court reduced the punitive damages against Smith to $100,000—giving Mackenzie the option to take the reduction or risk a new trial on the issue of damages—and dismissed Mackenzie's claim

against Best because the jury failed to award compensatory damages. Miller and Smith appealed.

¶ 8. In an exhaustive opinion, the court of appeals reversed the judgment of the circuit court. *Mackenzie v. Miller Brewing Co.*, 2000 WI App 48, 234 Wis. 2d 1, 608 N.W.2d 331. The majority found that this court's recent ruling in *Tatge v. Chambers & Owen, Inc.*, 219 Wis. 2d 99, 579 N.W.2d 217 (1998), foreclosed the tort of intentional misrepresentation in the employment at-will context. *Mackenzie*, 2000 WI App 48 at ¶ 25. The court proceeded to examine whether Miller had a duty to disclose information to Mackenzie that potentially affected his decision to continue employment at Miller and determined that the creation of such a duty "would undermine sound public policy." *Id.* at ¶ 43.

¶ 9. Then Judge Charles Schudson, writing for the majority, examined Mackenzie's evidence to determine whether even if the court were to recognize such a tort, Mackenzie had met the elements. *Id.* at ¶¶ 44–61. In the court's view, Mackenzie failed to present any credible evidence upon which the jury's verdict could be based. *Id.* at ¶¶ 46, 48. Therefore, the court rejected his claim and reversed the circuit court decision.[5] *Id.* at ¶ 102.

---

[5] As noted earlier, the court of appeals also affirmed the circuit court's dismissal of Mackenzie's wrongful termination claim at summary judgment. *Mackenzie v. Miller Brewing Co.*, 2000 WI App 48, 234 Wis. 2d 1, 608 N.W.2d 331. Mackenzie does not contest that ruling here. The court of appeals also reversed the ruling in favor of Mackenzie on his tortious interference with prospective contract action against Smith based on its review of the evidence. *Id.* at ¶¶ 62–70. Apparently, Mackenzie does not appeal that ruling either.

## II

¶ 10. Although Mackenzie's claim is fraught with problems, we need only examine the first issue. For Mackenzie, the insurmountable obstacle is that Wisconsin does not recognize a cause of action for the tort for intentional misrepresentation to induce continued employment in the at-will employment context. Nor do we now recognize such a cause of action. Because Mackenzie does not state a cause of action, Miller's motion to dismiss should have been granted by the circuit court.

### A

¶ 11. This case requires us to revisit the question of whether there is a cause of action for the tort of misrepresentation in the employment context. Whether or not a plaintiff has a cause of action in tort is a question of law subject to de novo review. *Slawek v. Stroh*, 62 Wis. 2d 295, 317, 215 N.W.2d 9 (1974).

¶ 12. Although it is unclear when employment at-will became an embedded fixture of Wisconsin employment relations, we first implicitly recognized the doctrine in 1871. *See Prentiss v. Ledyard*, 28 Wis. 131, 133 (1871).[6] Recent scholarship on at-will employ-

---

[6] In *Prentiss*, this court did not use the term "employment at-will." Rather, in a contract dispute between an employee and his employer over the term of a services contract, this court merely stated that "[e]ither party, however, was at liberty to terminate the service at any time, no definite period for which the service was to continue having been agreed upon." *Prentiss v. Ledyard*, 28 Wis. 131, 133 (1871). Therefore, while *Prentiss* is the first Wisconsin case where the employment at-will doctrine

ment has indicated that the doctrine was the default rule for employment contracts in this country because of a severe labor shortage in the late eighteenth and throughout the nineteenth centuries.[7] This scholarship calls into question the view that employment at-will was created at the end of the nineteenth century to benefit employers.[8] Regardless, we recently acknowl-

---

was applied to an employment dispute, this court did so without acknowledging it as a new doctrine.

[7] *See* Deborah A. Ballam, *The Development of the Employment At Will Rule Revisited: A Challenge to Its Origins as Based in the Development of Advanced Capitalism*, 13 Hofstra Lab. & Emp. L.J. 75 (1995) (observing that employment at-will was prevalent throughout the nineteenth century); Mayer G. Freed & Daniel D. Polsby, *The Doubtful Provenance of "Wood's Rule" Revisited*, 22 Ariz. St. L.J. 351 (1990) (noting that Wood's statement of the employee at-will rule was based on a well-established understanding of labor relations); Andrew P. Morriss, *Exploding Myths: An Empirical and Economic Reassessment of the Rise of Employment At-Will*, 59 Mo. L. Rev. 679 (1994) (disputing earlier scholarship on the employment at-will rule that had previously formed the basis for courts and commentators to advocate modification to the rule).

[8] *See* Jay M. Feinman, *The Development of the Employment At Will Rule*, 20 Am. J. Legal Hist. 118, 135 (1976). According to Feinman, the employment at-will rule was essentially created by Horace Gray Wood in his 1877 treatise—six years after our own decision implicitly applied the doctrine in *Prentiss*—with little foundation and adopted by the judiciary throughout the country, which sought to preserve our free enterprise system. Feinman, 126, 135. Thus, he contended that in light of "radical political economics," it is apparent that "[i]n the context of the control of labor and the discharge of employees, [the employment at-will] rule served the purposes of the owners of capital." *Id.* at 135. According to Feinman, employment at-will was created at the end of the nineteenth century to support "the dominion of the owners of capital over their employees and their

edged the centrality of employment at-will in *Hausman v. St. Croix Care Ctr.*, 214 Wis. 2d 655, 663, 571 N.W.2d 393 (1997), by asserting that "[t]he employment-at-will doctrine is an established general tenet of workplace relations in this jurisdiction." This is because the employment-at-will rule serves the interests of employees as well as employers.[9] It works to the employees'

enterprises. . .a basic element of the capitalist system." *Id.* at 133. His interpretation, however, has been questioned in recent years by other scholars who have asserted that employment at-will inured to the benefit of employees in a period of labor shortage. Professor Ballam has observed:

> Employment at will was adopted in colonial times in response to the unique economic conditions in the colonies created by the ready availability of free land, a severe labor shortage, and high labor costs. Laborers who could easily obtain free land wanted to work only long enough to accumulate enough capital to start their own farms and thus did not want to be bound to a long-term employment relationship.

Ballam, *Employment At Will Rule Revisited*, 13 Hofstra Lab. & Emp. L.J. at 88 n.86. Professor Ballam buttressed her observation in two subsequent articles that analyzed the law in nine states. *See* Deborah A. Ballam, *The Traditional View on the Origins of the Employment-At-Will Doctrine: Myth or Reality*, 33 Am. Bus. L.J. 1 (1995); *Exploding the Original Myth Regarding Employment-At-Will: The True Origins of the Doctrine*, 17 Berkeley J. Emp. & Lab. L. 91 (1995).

[9] *See* Richard A. Epstein, *In Defense of the Contract At Will*, 51 U. Chi. L. Rev. 947, 982 (1984) (concluding that "[t]he flexibility afforded by the contract at will permits the ceaseless marginal adjustments that are necessary in any ongoing productive activity conducted. . .in conditions of technological and business change"); Mayer G. Freed & Daniel D. Polsby, *Just Cause for Termination Rules and Economic Efficiency*, 38 Emory L.J. 1097 (1989) (discussing the greater efficiency created by an at-will employment system, which serves both the worker and employer).

advantage to have an at-will contract that allows them to leave their employers at any time for any reason.[10] An employment contract with a specific term could lock an employee into a disadvantageous relationship. The at-will doctrine provides employees and employers with much needed flexibility to fashion their own relations in a vibrant economy. It is a practical manifestation of our nation's values such as freedom of movement and entrepreneurial spirit. And it provides employees with the means to take control of their livelihoods. Therefore, it is the matrix of employee-employer contracts in Wisconsin.

## B

¶ 13. Given the flexibility that employment at-will affords employees, this court has been reluctant to interpose the judicial branch between employees and employers. *See Strozinsky v. District of Brown Deer*, 2000 WI 97, ¶ 33, 237 Wis. 2d 19, 614 N.W.2d 443 ("Courts will not second guess employment or business decisions, even when those decisions appear ill-advised or unfortunate."). In *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 572, 569, 335 N.W.2d 834 (1983), we recognized a narrow "public policy" exception to the doctrine of employment at-will and expressly rejected imposing a much broader "implied duty to terminate in good faith." Instead, this court adopted the "public pol-

---

[10] For example, Professor Holt argues that in the nineteenth century employers utilized the courts to hold employees to written employment contracts with specific terms, thereby revealing a bias against workers. Wythe Holt, *Recovery by the Worker Who Quits: A Comparison of the Mainstream, Legal Realist, and Critical Legal Studies Approaches to a Problem of Nineteenth Century Contract Law*, 1986 Wis. L. Rev. 677, 732 (1986).

icy exception" to the employment at-will doctrine by holding "that an employee has a cause of action for wrongful discharge when the discharge is contrary to a fundamental and well-defined public policy as evidenced by existing law." *Id.* at 573.[11] Several of our subsequent decisions have confronted this narrow exception.[12] None of our decisions, however, has abrogated the at-will doctrine by recognizing the tort of misrepresentation in the employment context. In fact, our recent decision in *Tatge* expressly forecloses such a cause of action.

¶ 14. In *Tatge*, an employee was dismissed for refusing to sign a non-compete agreement, despite

[11] In adopting this exception, we stated that "[n]o employer should be subject to suit merely because a discharged employee's conduct was praiseworthy or because the public may have derived some benefit from it." *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 573–74, 335 N.W.2d 834 (1983).

[12] *See Strozinsky v. District of Brown Deer*, 2000 WI 97, 237 Wis. 2d 19, 614 N.W.2d 443 (finding that an employee can raise constructive discharge defense in public policy exception cases where the employer alleges voluntary resignation); *Hausman v. St. Croix Care Ctr.*, 214 Wis. 2d 655, 668, 571 N.W.2d 393 (1997) (including situations where an employee is fired for his or her compliance with an affirmative obligation under the law); *Kempfer v. Automated Finishing, Inc.*, 211 Wis. 2d 100, 114, 564 N.W.2d 692 (1997) (holding that an employee cannot be forced to violate highway safety regulations); *Bushko v. Miller Brewing Co.*, 134 Wis. 2d 136, 142–44, 396 N.W.2d 167 (1986) (limiting the scope of the public policy exception to situations where the employee is terminated for refusing a command, instruction, or request of the employer to violate public policy as established by existing law); *Wandry v. Bull's Eye Credit Union*, 129 Wis. 2d 37, 46–47, 384 N.W.2d 325 (1986) (extending *Brockmeyer*'s public policy exception to include the "spirit" of a statutory provision).

being told that "nothing" would happen to him if he refused to sign. 219 Wis. 2d at 102–03. The employee sued his employer for breach of contract and three forms of fraudulent misrepresentation, including negligent, strict liability, and intentional misrepresentation. *Id.* at 104. The circuit judge allowed the employee to proceed on his negligent misrepresentation cause of action. This court reversed, emphatically stating that "[t]he breach of an employment contract is not actionable in tort." *Id.* at 107 (citations omitted).

¶ 15. Mackenzie attempts to evade the force of our opinion in *Tatge* by first arguing that there we were confronted with negligent misrepresentation, while here the cause of action is intentional misrepresentation. While the only cause of action that reached us in *Tatge* was negligent misrepresentation, we did not limit the holding in the manner that Mackenzie suggests. In *Tatge*, we stated unequivocally that "no duty to refrain from misrepresentation exists *independently* of the performance of the at-will employment contract." *Id.* at 108. Whether the misrepresentation was negligent or intentional was irrelevant to our holding that Tatge, like Mackenzie, failed to state a cause of action under Wisconsin law.

¶ 16. Mackenzie then argues that his "misrepresentation damages did not result from his termination, but from Miller and Smith's misrepresentations inducing the employment relationship. Absent the misrepresentations, Miller would not have been in a position to terminate Mackenzie because he would not have continued his employment with Miller." Therefore, Mackenzie maintains that his damages arise independently of his employment-at-will contract with Miller. Our *Tatge* opinion anticipated this argument.

713

Although "Tatge's request for damages in [that] case illustrates that his misrepresentation claim is *dependent* upon his termination from employment," we confronted Mackenzie's argument. *Id.* In *Tatge*, we wrote:

> We do not mean to suggest that litigants may circumvent the holding of this court simply by pleading damages which somehow do not arise solely from one's termination of employment. As we have said, a duty must exist independently from the performance of the employment contract in order to maintain a cause of action in tort.

*Id.* at n.4. Mackenzie is attempting to do exactly what we expressly prohibited in *Tatge*: circumvent the holding by pleading damages—his speculative loss of opportunity in finding employment elsewhere—that arose independently of the performance of the employment contract. We decline to overrule our decision in *Tatge* to create a new retroactive cause of action for Mackenzie.[13]

### III

¶ 17. Although we have recognized a new cause of action in certain compelling instances, we are apprehensive of injecting the judiciary between employees

---

[13] We recently reiterated the fundamental principle of stare decisis in *State v. City of Oak Creek*, 2000 WI 9, ¶ 55 n.27, 232 Wis. 2d 612, 605 N.W.2d 526:

> Fidelity to precedent, the doctrine of *stare decisis* 'stand by things decided', is fundamental to 'a society governed by the rule of law.' When legal standards 'are open to revision in every case, deciding cases becomes a mere exercise of judicial will, with arbitrary and unpredictable results.' (citations and quotations omitted).

and their employers, thereby altering basic tenets of our labor market and our economy. *See Anderson v. Continental Ins. Co.*, 85 Wis. 2d 675, 691–92, 271 N.W.2d 368 (1978) (recognizing an action for bad faith by an insurance company in denying a claim). First, the cause of action for intentional misrepresentation to induce continued employment that Mackenzie proposes would impose a corollary duty upon employees—that is, if the tort of intentional misrepresentation exists independently of the at-will contract, it could subject employees as well as employers to liability. Second, because such a cause of action would have a profound effect on potentially millions of employees, we believe that the legislature, not the courts, would be a more appropriate forum to address whether the at-will doctrine should be so altered. *See Slawek*, 62 Wis. 2d at 317–18. Finally, we decline to blur the essential lines that divide tort from contract. *See State Farm Mut. Ins. Co. v. Ford Motor Co.*, 225 Wis. 2d 305, 316–17, 592 N.W.2d 201 (1999).

A

¶ 18. The cause of action that Mackenzie urges this court to inject into the employment-at-will context would be based on Wisconsin's fraudulent representation tort.[14] *See Montreal River Lumber Co. v. Mihills,*

---

[14] Mackenzie argues in his brief to this court that "[a]lthough the tort [intentional misrepresentation to induce continued employment] is a novel one in Wisconsin, it is a logical and reasonable extension of the law of fraud to the workplace." We agree that the proposed cause of action for intentional misrepresentation to induce continued employment is novel, but we disagree that it is a logical and reasonable extension of the law of fraud. Instead, we believe this cause of

80 Wis. 540, 50 N.W. 507 (1891). The elements of a fraud claim are: (1) false representation; (2) intent to defraud; (3) reliance upon the false representation; and (4) damages. According to Mackenzie, "the policy of the State of Wisconsin is founded upon fundamental principles and must provide an employee the remedial right to recover from an employer for intentional misrepresentation to induce continued employment." Mackenzie argues that "fundamental fairness considerations require honest disclosure between employees and employers." *But see Brockmeyer*, 113 Wis. 2d at 567 (reiterating the rule that "an employer may discharge an employee 'for good cause, for no cause, or even for cause morally wrong' "). In Mackenzie's view, this court should impose a duty of disclosure in the workplace.[15] The parameters of this new tort are difficult for us to fathom. Although Mackenzie frames the cause of action in lofty language, he fails to note the possible effects. Such a cause of action could severely limit the freedom, flexibility, and privacy of employees as well as employers.

¶ 19. Injecting this cause of action into the at-will contract could require an employee to disclose informa-

action would engender a dramatic change in employee-employer relations, the effects of which cannot be fully comprehended by this court based on the record before us.

[15] We note, as the court of appeals did below, that there is a distinction between actions involving fraudulent inducements to commence employment and fraudulent inducements to continue employment. *See Mackenzie*, 2000 WI App 48 at ¶ 30 n.5. The essential difference is that fraudulent inducement to commence employment occurs prior to the formation of the at-will contract. Of course, both employees and employers may be subjected to a fraud action based on conduct that occurred prior to the formation of an at-will contract.

tion that an employer may reasonably rely upon to his or her detriment.[16] There are many perfectly good reasons that an employee may wish to keep a personal fact from his or her employer, even though if his or her employer knew the personal fact, the employer might dismiss the employee. *See Folely v. Interactive Data Corp.*, 765 P.2d 373 (Cal. 1988) (acknowledging that an employee has no duty to disclose information when it serves only the employer's private interest). In accordance with the reasons that supported the at-will doctrine at its inception in this country, an employee may not wish to disclose to his or her employer that he or she currently is seeking financing for his or her own venture or looking for employment elsewhere. To allow an employer to pursue a cause of action against that employee could change the employee and employer relationship and conceivably stifle the free movement of employees.[17] By removing the essential freedom an

---

[16] If the ostensible reason for this new cause of action is to promote honesty in the workplace, employers as well as employees would be able to utilize a fraudulent misrepresentation to induce continued employment cause of action against each other. Under current Wisconsin law, employers do not stand in a fiduciary relationship with their employees. *See Lehner v. Crane Co.*, 448 F. Supp. 1127, 1131 (E.D. Pa. 1978) (asserting that "an employer-employee relationship does not, in and of itself, give rise to a fiduciary relationship from which a duty to disclose could be derived"). Therefore, there is no distinction that would make this new cause of action applicable only to employees, unless this court were to arbitrarily fashion such a dichotomy. Such a dichotomy, however, would lack the clarity and legitimacy of statutory definitions of the key terms, such as "employee" and "employer."

[17] *See* Gail L. Heriot, *The New Feudalism: The Unintended Destination of Contemporary Trends in Employment Law*, 28 Ga. L. Rev. 167 (1993) (arguing that limiting the at-will doctrine

employee has to leave a firm at any time, we would concentrate power in the hands of a few large established firms that could use their ample resources to bind their employees to their payrolls through this new cause of action. In contrast, small start-ups or family businesses are less likely than large companies to have sophisticated personnel departments, which this new cause of action would require to reduce the risk of litigation. Instead, in a small company that has only a few employees, the employers and employees work with each other in a relatively unstructured relationship that develops and strengthens over time.

¶ 20. Indeed, Mackenzie's proposed broad cause of action fails to recognize the dynamic nature of at-will employment in practice. The employment at-will doctrine derives its vitality from the fact that the future is unknowable. Although the employee may tell his or her employer that he or she will be available for a certain period of time, subsequent events may cause the employee to leave, either to pursue an opportunity elsewhere or for some personal reason. Similarly, an employer may be unable to predict what will happen in the future. As Professor Epstein observed:

> The future is not clearly known. More important, employees, like employers, know what they do not know. They are not faced with a bolt from the blue, with an 'unknown unknown.' Rather they face a known unknown for which they can plan. The at-will contract is an essential part of that planning [for the known unknown] because it allows both

will contribute to the "feudalization" of employment relations and lead employers to become more active in influencing what an employee does off the job).

sides to take a wait-and-see attitude to their relationship so that new and more accurate choices can be made on the strength of improved information.

Richard A. Epstein, *In Defense of the Contract At Will*, 51 U. Chi. L. Rev. 947, 969 (1984). The at-will employment doctrine creates a subtle contractual relationship between the employee and employer that enables each to deal with this known unknown, which is that the employee and employer both know that something will happen in the future, but neither the employee nor the employer knows what that something is. When a future event occurs, the employee and the employer have the freedom to respond appropriately. Interposing the courts—absent a clearly defined statute—into this subtle relationship could suppress its dynamic nature.

## B

■

¶ 21. These unforeseen effects lead us to stay our hand from creating a new cause of action for intentional misrepresentation to induce continued employment.[18] Over 3,000,000 Wisconsin citizens are currently employed.[19] Of those 3,000,000, approximately 490,000 are labor union members and therefore are presumably covered by a collective bargaining con-

---

[18] We have been unable to find any jurisdiction in this country that recognizes the cause of action advanced by Mackenzie.

[19] Chicago Regional Economic Analysis and Information Office, Bureau of Labor Statistics (Dec. 15, 2000). There are no definite statistics on how many workers have at-will contracts, but since it is the default rule, most workers, except union members and independent contractors, work on an at-will basis.

tract.[20] A substantial number of the remaining 2,500,000 undoubtedly have at-will contracts with their employers since it is the default rule in our state. *Brockmeyer*, 113 Wis. 2d at 572. We believe that this court—in accordance with the principle of judicial restraint—should tread lightly when asked to recognize a new cause of action that could affect so many citizens, particularly since we have only the present record before us. *See Doering v. WEA Ins. Group*, 193 Wis. 2d 118, 132, 532 N.W.2d 432 (1995) (noting that this court is aware "drawing lines and creating distinctions to establish public policy are legislative tasks"); *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 27, 288 N.W.2d 95 (1980) (observing that "when a court resolves a question of legal duty the court is making a policy determination"). As Justice Frankfurter observed in his dissent in *Sherrer v. Sherrer*, 334 U.S. 343, 366 (1948):

> Courts are not equipped to pursue the paths for discovering wise policy. A court is confined within the bounds of a particular record, and it cannot even shape the record. Only fragments of a social problem are seen through the narrow windows of a litigation. Had we innate or acquired understanding of a social problem in its entirety, we would not have at our disposal adequate means for constructive solution.

Such is the case here. The legislature, with all its resources and investigative powers, is the appropriate forum for such a sweeping policy decision, which would

---

[20] Barry Hirsch & David Macpherson, *Union Membership and Earnings Data Book: Compilations from the Current Population Survey*, The Bureau of National Affairs, Inc., Washington, D.C. (1999).

affect millions of Wisconsin citizens. *See Brockmeyer*, 113 Wis. 2d at 573 ("Courts should proceed cautiously when making public policy determinations.").

¶ 22. In other circumstances, we likewise have declined to create a new cause of action that would dramatically alter our social fabric. In *Slawek*, we considered whether or not to recognize the tort of "wrongful birth" as a cause of action. While we acknowledged that this court has the power to recognize such a cause of action, we declined because "recognition of a cause of action for wrongful birth would have vast social ramifications and the creation of such a cause of action is the type of public policy decision that should be made by the people of this state or their elected representatives." 62 Wis. 2d at 317–18. A cause of action for intentional misrepresentation to induce continued employment would similarly have profound economic ramifications and cause corresponding social changes. Hence, we believe that it would be inappropriate for us to abrogate the employment at-will doctrine by injecting into it a tort cause of action. *See Tatge*, 219 Wis. 2d at 107 ("We decline to give our blessing to such an irreverent marriage of tort and contract law.").

## C

¶ 23. By asking us to recognize a tort cause of action in a contractual relationship, Mackenzie is essentially asking us to envelop contract law with tort law. It is undisputed that Mackenzie had an at-will contract with Miller. Rather than a breach of contract

claim, Mackenzie's action for intentional misrepresentation necessarily sounds in tort.[21]

¶ 24. In another case, the facts may support a remedy in contract law. For example, the employee handbook may form the terms of the employment contract and the employer or the employee may violate those terms. In *Ferraro v. Koelsch*, 124 Wis. 2d 154, 169, 368 N.W.2d 666 (1985), we held that "the particular personnel manual used by Hyatt. . .containing the conditions it did and which were specifically accepted by Ferraro and under which conditions he agreed to continue work, constituted a contract for something other than an employment contract terminable at will." We further noted that "we do not hold that all personnel manuals or employee handbooks will have that effect." *Id.*; *see also Vorwald v. School Dist. of River Falls*, 167 Wis. 2d 549, 558, 482 N.W.2d 93 (1992) (holding that a particular personnel policy without evidence that either party agreed to be bound by its terms did not create a contract, implied or otherwise). Thus, while a particular employee handbook could give rise to an action in contract, that is not the case presently before us.

¶ 25. Similarly, there might be a cause of action sounding in contract under promissory estoppel. We first recognized promissory estoppel in *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 698, 133 N.W.2d 267 (1965). There, we asserted that three questions must be answered affirmatively to give rise to an action for

---

[21] Mackenzie acknowledges his inability to bring a contract action against Miller. In his brief, he states that "Mackenzie had no contract cause of action against Miller or Smith for their intentional misrepresentations. Miller did not break any promise."

promissory estoppel: "(1) Was the promise one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee? (2) Did the promise induce such action or forbearance? (3) Can injustice be avoided only by enforcement of the promise?" We have previously examined this doctrine in the at-will employment context. *See Smith v. Beloit Corp.*, 40 Wis. 2d 550, 556–57, 162 N.W.2d 585 (1968) (reasserting that justice does not require the application of promissory estoppel where employee left former job based on promise of "permanent employment"); *Forrer v. Sears, Roebuck & Co.*, 36 Wis. 2d 388, 392, 153 N.W.2d 587 (1967) (holding that justice does not require the invocation of promissory estoppel where employee alleges that he gave up his farming operations at great financial loss in consideration for "full-time permanent employment"). Therefore, in another case, promissory estoppel might be an appropriate cause of action in the employment context. A cause of action for promissory estoppel in the employment context, like a contract cause of action based on an employee handbook, is in accordance with Wisconsin contract law when the particular facts indicate that the parties altered the default relationship of at-will employment.

¶ 26. But here, the record demonstrates that there is no remedy for Mackenzie in contract law. Therefore, he seeks to shoehorn a tort cause of action into his at-will contractual relationship with Miller. Absent an applicable statute, we reject his attempt to create this tort within a contractual relationship and emphasize the need to preserve the boundary between tort law and contract law.

¶ 27. We have noted that "[i]t is important to maintain this distinction [between tort and contract law] because the two theories serve very different purposes." *State Farm*, 225 Wis. 2d at 315. Tort law "rests on obligations imposed by law." *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis. 2d 395, 405, 573 N.W.2d 842 (1998). On this score, we said "[t]ort law is rooted in the concept of protecting society as a whole from physical harm to person or property." *Id.* (citations omitted). Further explicating the foundations of tort law, we wrote that "[t]ort law was designed to protect people from unexpected losses that amount to an overwhelming misfortune that a person may be unprepared to meet." *State Farm*, 225 Wis. 2d at 316 (citations omitted). Hence, tort law "serves the 'prophylactic' purpose of preventing future harm; payment of damages provides a strong incentive to prevent the occurrence of harm." *Merten v. Nathan*, 108 Wis. 2d 205, 211–12, 321 N.W.2d 173 (1982). Because tort law protects society as a whole, recovery in appropriate circumstances can include punitive or exemplary damages, which are designed "to punish the wrongdoer and to deter the wrongdoer and others from engaging in similar conduct." *Apex Electronics Corp. v. Gee*, 217 Wis. 2d 378, 389, 577 N.W.2d 23 (1998) (citations omitted).

¶ 28. In contrast, contract law "is based on obligations imposed by bargain, and it allows parties to protect themselves through bargaining." *State Farm*, 225 Wis. 2d at 316–17 (citations omitted). Contract law does not involve the same broader societal concerns as tort law for "the individual limited duties implicated by the law of contracts arise from the terms of the agree-

ment between the particular parties." *Daanen*, 216 Wis. 2d at 404 (citations omitted). Thus, the damages allowed in a contract action "[are] limited to the parties to the contract or those for whose benefit the contract was made." *State Farm*, 225 Wis. 2d at 317. Because the law encourages economic exchanges and seeks to foster predictability, punitive damages are not allowed in a breach of contract action; to allow otherwise would chill the formation of contracts and reduce predictability.[22] Parties who enter into contracts expect courts to enforce the terms, which the law requires unless the contract is for an illegal purpose or a party lacked capacity. *See Merten*, 108 Wis. 2d at 211 ("The courts protect each party to a contract by ensuring that the promises will be performed. The law protects justifiable expectations and the security of transactions."). Essentially, contract law is based upon the principles of free will and consent, whereas tort law is based upon the principles of risk-sharing and social duties.

¶ 29. In the present case, Mackenzie freely consented to entering into a contractual at-will relationship with Miller in 1974—there is no allegation that he was fraudulently induced into this relationship. During his tenure at Miller, he was free to leave

---

[22] In *Merten*, we acknowledged the important public policy of the freedom to contract by quoting the Supreme Court in *Baltimore & Ohio Sw. Ry. Co. v. Voigt*, 176 U.S. 498, 505 (1900): " 'if there is one thing which more than another public policy requires it is that men of full age and competent understanding shall have the utmost liberty of contracting, and that their contracts, when entered into freely and voluntarily, shall be held sacred, and shall be enforced by courts of justice.' " *Merten v. Nathan*, 108 Wis. 2d 205, 212 n.5, 321 N.W.2d 173 (1982). Mackenzie does not allege that he did not freely enter into his at-will contract with Miller.

at any point for opportunities elsewhere, just as Miller was free to dismiss Mackenzie. Under the at-will contract between Miller and Mackenzie, Miller had no obligation to inform Mackenzie of any decisions that it made or intended to make and Mackenzie had no obligation to inform Miller of any decisions he made or intended to make. Now, after Miller exercised its contractual right in dismissing Mackenzie, he asks this court to create a retroactive cause of action in tort that would address his alleged grievance—that Miller had a duty to inform him of his status and failed to do so. We decline to create such an action. Under the law of Wisconsin, individuals can enter into at-will employment contracts and terminate those relationships for good cause, no cause, or morally wrong cause. While we do not condone employers misrepresenting a fact to their employees—just as we do not support employees misrepresenting a fact to their employers—we find that the cause of action must be found in contract rather than tort law. Finally, we reject the notion that either employees or employers have a duty to inform the other of a fact the other conceivably may rely upon absent a statute to the contrary.

## IV

■

¶ 30. In conclusion, we hold that there is not a cause of action in Wisconsin for intentional misrepresentation to induce continued employment. Thus, Mackenzie failed to state a cause of action against Miller and Smith. We therefore affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

¶ 31. N. PATRICK CROOKS, J., did not participate.

¶ 32. SHIRLEY S. ABRAHAMSON, CHIEF JUSTICE *(concurring)*. The lengthy majority opinion boils down to adopting this rule of law: When an employer deliberately and intentionally lies to an at-will employee to induce the employee to continue employment and the employee continues to work relying on those lies, and then sustains damages as a result of reliance on the lies, the employee cannot sue in a tort action for damages. I cannot join this opinion.

¶ 33. Wisconsin's general rule of law is that everyone is liable for damages for intentional misrepresentation.[1] The majority opinion carves out an exception to this general rule and states that employers are not liable to at-will employees for damages for intentional misrepresentation. It's one thing to say that the elements of the tort of intentional misrepresentation have not been met in the present case. I therefore concur. It's entirely another thing to say, as the majority opinion does in the present case, that the tort of intentional misrepresentation never applies in an employment-at-will relationship.[2]

---

[1] The elements of the tort of intentional misrepresentation are: the defendant made a representation of fact; the representation of fact was untrue; the untrue representation was made by the defendant knowing the representation was untrue or recklessly without caring whether it was true or false; the defendant made the representation with intent to deceive and induce the plaintiff to act upon it to the plaintiff's pecuniary damage; and the plaintiff believed such representation to be true and relied on it. *See* Wis JI—Civil 2401.

[2] The majority overlooks persuasive authority from numerous jurisdictions that have allowed this cause of action in the

¶ 34. I join ¶ 25 of the opinion in which the majority opinion recognizes an employee-at-will's cause of action under the doctrine of promissory estoppel. It is the lack of a contract in at-will employment that allows claims for promissory estoppel.[3]

¶ 35. For the reasons set forth, I write separately.

¶ 36. I am authorized to state that Justice WILLIAM A. BABLITCH joins this concurrence.

employment-at-will context. *See, e.g.,* Frank J. Cavico, *Fraudulent, Negligent, and Innocent Misrepresentation in the Employment Context: The Deceitful, Careless, and Thoughtless Employer,* 20 Campbell L. Rev. 1, 4–5 (1997) (providing an overview of the case law on employer misrepresentation, including several cases in the at-will employment context).

[3] Other theories of recovery exist. *See, e.g.,* ¶ 24 of the majority opinion; *Brodsky v. Hercules, Inc.,* 966 F.Supp. 1337, 1351 (D. Del. 1997) (a cause of action for breach of an implied covenant of good faith and fair dealing exists when the employer misrepresents some important fact, most often the employers' present intention, and the employee relies thereon either to accept a new position or remain in a present one).