Duane D. BETTERMAN, Plaintiff-Respondent,

v.

FLEMING COMPANIES, INC., Defendant-Appellant.

Court of Appeals

*No. 02–2617. Submitted on briefs January 6, 2004.—Decided February 17, 2004.*

2004 WI App 44

(Also reported in 677 N.W.2d 673.)

198

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Eric J. Magnuson* and *Daniel Q. Poretti* of *Rider, Bennett, Egan & Arundel, LLP*, Minneapolis.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Kyle H. Torvinen, Kristin M. Watson* and *Tony Breidenbach* of *Hendricks, Knudson, Gee & Torvinen, S.C.*, Superior.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. PETERSON, J. Fleming Companies, Inc., appeals a judgment awarding compensatory and punitive damages to Duane Betterman. Betterman, who worked

for Fleming, suffered a mental breakdown at work. He claimed that during his recovery, Fleming falsely assured him that he had a job waiting. Fleming argues: (1) an employee cannot sue an employer for intentional misrepresentation; (2) the existence of a contractual relationship bars a claim for promissory estoppel; (3) the court made numerous errors in computing compensatory damages; and (4) the punitive damages award is excessive. We affirm the judgment.

## BACKGROUND

¶ 2. Betterman worked for Fleming and its predecessors for over thirty-one years. Eventually, he was promoted to the position of pricing coordinator. In 1996, Fleming restructured. Betterman's responsibilities increased and he reported to multiple supervisors in different parts of the country.[1] Each supervisor insisted his or her work was a priority. Betterman began working in excess of eleven hours per day, plus weekends.

¶ 3. On February 21, 1997, Betterman suffered a mental breakdown at work. He was admitted to St. Luke's Hospital in Duluth where he was diagnosed with a major depressive disorder and anxiety related to his job.

¶ 4. Fleming's human resources manager, Susan Morrison, sent Betterman forms to fill out for leave under the Family and Medical Leave Act (FMLA). The forms stated Fleming's leave policy that after FMLA leave was exhausted, an employee could go on paid medical leave for approximately fourteen weeks. Then the employee could either go back to work or resign and receive long-term disability benefits. MetLife, Fleming's

---

[1] Betterman's supervisors were located in Wisconsin, Oregon, Oklahoma, and Minnesota.

disability insurance carrier, would provide the long-term disability benefits. The employee would be terminated if he or she did not return to work immediately following the leave of absence.

¶ 5. Betterman met with Morrison on February 27 to discuss the forms. The application for leave of absence consisted of eleven pages. The first part, slightly over three pages long, was entitled "Associate to Complete." It ended with a signature block. The next six pages were entitled "Associate Support Representative to Complete." The third part was for management signatures. The last page, which was to be signed by the employee, was the "Acceptance of Terms of Leave by Associate."

¶ 6. Betterman signed the first part of the application in Morrison's office. Morrison then turned to the last page and told Betterman he needed to sign there as well. Betterman indicated he had not read the section entitled "Associate Support Representative to Complete." There was language in this section indicating that Betterman would be terminated if he did not return to work after his long-term benefits expired. Betterman testified that Morrison said, "Don't worry about it, it don't [sic] pertain to you at this time, don't worry about it. I just need to have that signed so I can continue to send you your paychecks while you're on this leave." Betterman then signed the last page. Morrison never told Betterman about the language indicating he would be resigning.

¶ 7. On April 1, 1997, Fleming sent Betterman a letter stating that long-term disability benefits would begin on August 21, 1997. This is the day Fleming considered Betterman's employment to be terminated, pursuant to its policy.

¶ 8. Betterman testified that after his breakdown he went to Fleming several times. He stated he had conversations with Morrison; with John Sorci, his supervisor; and with Perry Flemmen, the general manager. Betterman testified that he spoke to each of these people about returning to work when he was well again. He stated no one ever told him that he was terminated. For example, Sorci told him, "Duane, don't worry about your job, don't worry about work. He said, you just get better, and when you get better, when you get your release from the doctor, then we'll worry about that." Betterman also stated that Flemmen told him that he would report to Flemmen when he returned to work.

¶ 9. In November 1997, Betterman decided to take funds out of his 401(k) but the fund manager told him he could not withdraw funds because Fleming notified the fund that Betterman was terminated. Consequently, Betterman would either need to take all the money out of his 401(k) or none at all. Betterman then called Morrison, who assured him that he was not terminated and that she would take care of the problem. Betterman contacted the fund several times and was told each time that he was terminated. Eventually, Betterman rolled his 401(k) over into a different account.

¶ 10. In April 1998, MetLife notified Betterman that his disability benefits would terminate on May 21. Betterman went to Fleming to see about returning to work. Morrison told him he would need a letter from a doctor authorizing his return to work. Betterman's psychologist, Dr. Ellen Halverson, wrote a letter stating that Betterman could return to work with limitations. According to Betterman, Morrison said she would send the letter to corporate headquarters to "find out where they're going to start you and what is going to happen."

¶ 11. Betterman then received a letter from Fleming that stated he had not been an employee since August 21, 1997, pursuant to Fleming's leave policy. Betterman testified he did not know he had been terminated until he received this letter.

¶ 12. Betterman first looked for other employment in June 1999. He contacted a friend who owned a grocery store and began working there in July. His long-term disability benefits terminated on August 22, 1999.[2]

¶ 13. Betterman filed suit against Fleming alleging discrimination because of his disability, intentional misrepresentation and promissory estoppel. A six-day trial began on January 14, 2002. The jury determined that Fleming did not discriminate against Betterman. However, the jury did find that Fleming intentionally misrepresented to Betterman that he could return to work. The jury also concluded that Fleming made an express promise to Betterman that he would be employed at Fleming. The jury found that Fleming acted with malice or intentionally disregarded Betterman's rights and awarded Betterman punitive damages of $300,000.

¶ 14. Pursuant to a stipulation, the court conducted a bench trial to determine compensatory damages. The court determined Betterman was entitled to $255,666 for loss of wages, loss of social security benefits, loss of investment income and loss of health insurance benefits.

---

[2] Betterman had successfully appealed MetLife's decision that his long-term disability benefits terminated on May 21, 1998. Thus, his benefits were extended from May 21, 1998, through August 22, 1999.

## STANDARD OF REVIEW

¶ 15. Our review of a jury's verdict is narrow. We will sustain a jury verdict if there is any credible evidence to support it. *Meurer v. ITT Gen. Controls*, 90 Wis. 2d 438, 450, 280 N.W.2d 156 (1979). In applying this narrow standard of review, we consider the evidence in a light most favorable to the jury's determination. *Id.* It is the jury's role, not an appellate court's, to balance the credibility of witnesses and the weight given to the testimony of those witnesses. *Id.* To that end, we search the record for credible evidence that sustains the jury's verdict, not for evidence to support a verdict that the jury could have reached but did not. *Gonzales v. City of Franklin*, 137 Wis. 2d 109, 134, 403 N.W.2d 747 (1987).

¶ 16. The standard of review in this case is even more stringent because the circuit court approved the jury's verdict by denying Fleming's motions after the verdict. We afford special deference to a jury determination in those situations in which the trial court approves the jury's finding. *Kuklinski v. Rodriguez*, 203 Wis. 2d 324, 331, 552 N.W.2d 869 (Ct. App. 1996). In such cases, we will not overturn the jury's verdict unless "there is such a complete failure of proof that the verdict must be based on speculation." *Coryell v. Conn*, 88 Wis. 2d 310, 315, 276 N.W.2d 723 (1979).

## DISCUSSION

### Intentional misrepresentation

¶ 17. Fleming argues that Wisconsin law does not allow an employee to sue an employer for intentional misrepresentation. Instead, Fleming contends that Betterman can only have a claim based on contract. Fleming cites two cases in support of its argument, *Tatge v. Chambers & Owen, Inc.*, 219 Wis. 2d 99, 579 N.W.2d 217 (1998), and *Mackenzie v. Miller Brewing Co.*, 2001 WI 23, 241 Wis. 2d 700, 623 N.W.2d 739.

█

¶ 18. In the first case, Tatge filed a claim for intentional misrepresentation against his employer. Tatge argued his supervisor told him nothing would happen if Tatge refused to sign a covenant not to compete. Tatge refused to sign the covenant and was subsequently terminated as a result. *Tatge*, 219 Wis. 2d at 103–04. The supreme court stated:

> We cannot overlook the fact that Tatge's misrepresentation claim finds its lifeline in the improper performance of an employment contract. In other words, Tatge argues that [his employer's] alleged misrepresentation that Tatge would be terminable only for good cause tainted his subsequent termination from employment without good cause.

*Id.* at 107. A breach of an employment contract is not actionable in tort. *Id.* Thus, Tatge did not have a valid claim for misrepresentation, but only breach of contract. *Id.* at 107–08.

¶ 19. In the second case, Mackenzie was an at-will employee whose supervisor told him the company's reorganization would not affect his position grade level. However, the company did later downgrade employees.

Mackenzie sued for intentional misrepresentation. *Mackenzie*, 241 Wis. 2d 700, ¶ 14–15. Following its holding in *Tatge*, the supreme court stated that "no duty to refrain from misrepresentation exists *independently* of the performance of the at-will employment contract." *Mackenzie*, 241 Wis. 2d 700, ¶ 15 (citing *Tatge*, 219 Wis. 2d at 108). Thus, like Tatge, Mackenzie did not have a claim for misrepresentation.

¶ 20. Fleming contends the facts here are similar to those in *Tatge* and *Mackenzie* and therefore Betterman's claim for intentional misrepresentation should be dismissed. However, there is an important distinction between this case and *Tatge* and *Mackenzie*. In those cases, the misrepresentations were made while Tatge and Mackenzie were still employed by their respective employers. The misrepresentations made by Fleming to Betterman were made after he was terminated. In fact, the *Tatge* court stated that if "no employment relationship existed at the time of the misrepresentations, any duty to refrain from misrepresentation must have existed independently from the performance of [the] employment contract." *Tatge*, 219 Wis. 2d at 109. Consequently, the rule barring intentional misrepresentation claims where there is an at-will contract does not apply when there is no employment relationship.

¶ 21. *Hartwig v. Bitter*, 29 Wis. 2d 653, 139 N.W.2d 644 (1966), a case cited in *Tatge*, is instructive. There, an employer made misrepresentations in order to induce prospective employees to work for the employer. *Id.* at 655. The supreme court allowed an intentional misrepresentation claim because no em-

207

ployment relationship existed at the time of the misrepresentations. *Id.* at 658; *Tatge*, 219 Wis. 2d at 109. Here, Betterman was terminated on August 21, 1997. After that time, when Betterman called about his 401(k), Morrison assured him he was not terminated. Further, Morrison implied. Betterman was still employed at Fleming when she asked Betterman for a doctor's authorization for him to return to work.

¶ 22. Other employees also assured Betterman he would have a job at Fleming. Sorci, his supervisor, assured him he was still employed, as did Flemmen, the general manager. Fleming argues Betterman cannot prove exactly when these conversations took place, or even that they took place at all.[3] However, Betterman testified that he visited Fleming several times throughout 1997 and 1998. The jury could therefore conclude that Sorci's and Flemmen's statements occurred after August 21, 1997. Whether and when the statements took place was a credibility determination. *Meurer*, 90 Wis. 2d at 450.

██

¶ 23. Fleming argues, however, that even if Betterman does have a claim for intentional misrepresentation, the evidence does not support the jury's verdict. Three elements are necessary to prove intentional misrepresentation: (1) the statement of fact must be false; (2) the statement must be made with the intent to defraud and for the purpose of inducing the other party to act; and (3) the other party must rely on the false

---

[3] Sorci testified that his conversation with Betterman took place before Betterman was terminated. Flemmen denied having the conversation Betterman testified they had regarding who Betterman would report to when he returned to work.

statement to his or her detriment. *First Credit Corp. v. Myricks*, 41 Wis. 2d 146, 149, 163 N.W.2d 1 (1968).

¶ 24. Fleming's arguments essentially ignore our standard of review and argue credibility and weight determinations. Fleming first contends there is no credible evidence of specific false statements. It argues the statements by Morrison and others were merely broad and vague assurances. However, Fleming terminated Betterman on August 21, 1997. After that time, Betterman spoke to Morrison about returning to work and Morrison never told him he was terminated. In fact, Morrison specifically told Betterman that he was not terminated when he asked about his 401(k). Morrison testified that she knew he was terminated but did not tell him because she did not think it was her responsibility to do so. Thus, what Morrison told Betterman was false. Similarly, Sorci's and Flemmen's statements were false.

¶ 25. Second, Fleming argues there is no evidence of intent to deceive Betterman. Intent requires that the statement was untrue or made with reckless disregard as to whether it was true. *See Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17, 25, 288 N.W.2d 95 (1980). Fleming maintains Morrison and other supervisors were merely concerned with Betterman's well-being. Fleming therefore claims no statements were made with any intent to deceive Betterman. However, Morrison and others knew Betterman was terminated and yet assured him he was not. Because they knew the statements were untrue, intent may be inferred. *See Polley v. Boehck Equip. Co.*, 273 Wis. 432, 436, 78 N.W.2d 797 (1956).

¶ 26. Third, Fleming argues there is no evidence that Betterman detrimentally relied on the misstatements. It contends that Betterman never turned down other employment based on these statements. Fleming maintains Betterman's only reliance was tailoring his therapy toward returning to work and remodeling the deck on his home. Fleming argues Betterman would have worked to improve his mental health regardless of the misstatements. Further, Betterman's health care providers advised him to do home improvement projects as therapy. Therefore, to the extent Betterman relied on the misstatements, Fleming concludes the reliance was not detrimental.

¶ 27. However, the sole focus of Betterman's treatment was geared toward returning to work.[4] As the trial court noted:

> There is sufficient evidence from which a jury could conclude that he relied upon returning to work in the manner in which he sought treatment and in how he dealt with his family and friends and made plans. To suggest that he would have done the same things regardless of whether he knew he was terminated or not is not persuasive in light of this record.

The jury also found detrimental reliance on Betterman's remodeling of his deck. Betterman testified he spent the money on the project in reliance on Fleming's assertions that he had a job waiting for him.

---

[4] Instead of making plans for retirement, Betterman did work-related therapy, including occupational therapy and participating in groups directed toward setting goals, reducing stress, and learning assertiveness. Betterman, his family, his friends, and his therapist all stated Betterman specifically directed his therapy towards returning to work.

The jury believed Betterman's testimony and concluded it was likely he would not have incurred the project's cost had he known he was terminated.

### Promissory estoppel

¶ 28. Fleming also argues that Betterman's promissory estoppel claim cannot stand. However, the circuit court did not assess damages on the promissory estoppel claim[5] and, therefore, we do not address it.

### Compensatory damages

¶ 29. Fleming argues the court improperly awarded compensatory damages. When reviewing a damage award, we must consider evidence most favorable to the award, and sustain it if there is any credible evidence to support it. *Roach v. Keane*, 73 Wis. 2d 524, 539, 243 N.W.2d 508 (1976).

¶ 30. The measure of damages for intentional misrepresentation is the benefit of the bargain. *Skrupky v. Elbert*, 189 Wis. 2d 31, 47, 526 N.W.2d 264 (Ct. App. 1994); *Lundin v. Shimanski*, 124 Wis. 2d 175, 195, 368 N.W.2d 676 (1985). Under the benefit of the bargain rule, a plaintiff is entitled to damages equivalent to what the plaintiff would have received if the representation had been true. *Skrupky*, 189 Wis. 2d at 47.

¶ 31. Fleming argues that the misrepresentation occurred in November 1997 when Betterman spoke to Morrison about his 401(k) and Morrison failed to tell Betterman he was terminated. Yet, the court awarded

---

[5] The court did not award damages for promissory estoppel because they would have been the same as for intentional misrepresentation and therefore duplicative.

damages for lost wages beginning not in November 1997, but in May 1998. Fleming maintains that the damages are not related to the November 1997 misrepresentation. However, if the representation had been true, Betterman would have begun working again in May 1998, which is when Dr. Halverson authorized his return to work.

¶ 32. Fleming argues, however, that Betterman was not able to return to work. Fleming contends none of Betterman's doctors testified that Betterman was able to return to his former position. Again, Fleming is simply disputing the evidence. Dr. Halverson specifically released him to work, though with limitations. She also testified that Betterman could have returned to his previous job "if the expectations on him had been clearer."

¶ 33. Further, Fleming argues Betterman never pursued alternate employment when he realized he was terminated. The court recognized this when it made its compensation award, stating, "[Betterman's] job search efforts in January and February of 1999 were minimal at best and were not substantial until finding part-time work with [the grocery store]. . . . [H]is job efforts during this period of time were not reasonable." The court therefore reduced the wage loss calculation by $10,000. Thus, there is sufficient evidence to support the court's award for wage loss.

¶ 34. Next, Fleming argues Betterman's wage loss must be offset by the amount he received in long-term disability payments. This argument requires examination of the collateral source rule. Under the rule, a plaintiff's recovery cannot be reduced by payments the

plaintiff receives from other sources. *Koffman v. Leichtfuss*, 2001 WI 111, ¶ 29, 246 Wis. 2d 31, 630 N.W.2d 201. The collateral source rule was developed not to provide the injured party with a windfall, but instead to prevent tortfeasors from escaping their obligations to compensate an injured party merely because a collateral source also compensated the injured party. *Id.*, ¶ 29 (citing *Ellsworth v. Schelbrock*, 2000 WI 63, ¶ 7, 235 Wis. 2d 678, 611 N.W.2d 764). In *Ellsworth*, 235 Wis. 2d 678, ¶ 7, the supreme court explained that a tortfeasor who is legally responsible for a plaintiff's damages is not relieved of that obligation simply because the plaintiff had the foresight to arrange for benefits from a collateral source. We therefore must determine whether the collateral source rule applies in this case.

¶ 35. Fleming argues the collateral source rule does not apply here because Betterman's long-term disability benefits were in effect paid by Fleming. Fleming asserts that although it had no duty to do so, it paid 100% of the cost of maintaining the disability policy through MetLife.

¶ 36. However, our supreme court has stated that the collateral source rule applies to benefits earned by employees as part of their compensation. *Salveson v. Douglas County*, 2001 WI 100, ¶ 56, 245 Wis. 2d 497, 630 N.W.2d 182. Here, the circuit court found that the right to disability payments was "part of an overall benefits package which was part of [the plaintiff's] salary which was intended to attract qualified people to this position."

¶ 37. The seventh circuit made a similar ruling in *EEOC v. O'Grady*, 857 F.2d 383 (7th Cir. 1988), a case dealing with pension benefits, which *Salveson* cites. The seventh circuit stated: "the pension benefits may

be viewed as *earned* by the claimants and therefore not paid by the employer at all. Like an insurance policy provided by an employer, the pension benefits here were part of the claimants' compensation." *Id.* at 391 (citing *In re Air Crash Disaster*, 803 F.2d 304, 308 (7th Cir. 1986) ("[I]nsurance was as much a part of the compensation [the former employee] received from his employer as were his salary, fringe benefits, and pension benefits.").

¶ 38. Here, the disability benefits were part of Betterman's compensation. As the circuit court stated, the benefit was "part of an overall benefit package which was part of his salary which was intended to attract qualified people to this position." Thus, the fact that Fleming paid the premium on the MetLife disability policy is only important insofar as it represented part of Betterman's compensation.

¶ 39. Finally, Fleming argues the court improperly awarded damages for lost investment income and reduced social security benefits. We must sustain a damages award if there is any credible evidence that under any reasonable view supports it and removes the issue from the realm of conjecture. *Kersten v. H.C. Prange Co.*, 186 Wis. 2d 49, 59, 520 N.W.2d 99 (Ct. App. 1994).

¶ 40. The court awarded Betterman $34,433 for lost investment income because Betterman was unable to make voluntary investments into his 401(k), and moreover, was forced to withdraw $1,500 a month from his 401(k). Fleming contends that at the time of the misrepresentation by Morrison regarding his 401(k), Betterman had already made the decision to withdraw

funds. Therefore, Fleming argues, the award for lost investment income did not result from Fleming's misrepresentations. Further, Fleming argues that the award is speculative because there is no evidence to support a 10% rate of return.

¶ 41. However, had Betterman been able to return to work at Fleming, he would have continued investing in his 401(k) and received a return on that investment. Therefore, the lost income was a direct result of Fleming's misrepresentations. Additionally, the court's use of a 10% rate of return was appropriate. The court has discretion to fix a reasonable rate of return. *Hawes v. Germantown Mut. Ins. Co.*, 103 Wis. 2d 524, 532–33, 309 N.W.2d 356 (Ct. App. 1981).

¶ 42. The court also awarded Betterman $12,445 for estimated loss of social security benefit payments because Betterman began receiving the payments at age sixty-two rather than sixty-five. Fleming again maintains Betterman's decision was not a result of any misrepresentation by Fleming. However, if Betterman had returned to work at Fleming, he would not have had to take his social security payments early. This was again a result of Fleming's misrepresentations that Betterman had a job waiting for him.

**Punitive damages**

¶ 43. Fleming argues the award of punitive damages was excessive. An award of punitive damages is within a jury's discretion. *Jacque v. Steenberg Homes*, 209 Wis. 2d 605, 626, 563 N.W.2d 154 (1997). Nevertheless, a trial court may reduce punitive damages if the

award is so clearly excessive as to indicate that the award was the product of passion or prejudice. *Id.* On review, we construe the evidence most favorably to the jury's verdict. *Durham v. Pekrul,* 104 Wis. 2d 339, 349, 311 N.W.2d 615 (1981).

¶ 44. When determining whether an award of punitive damages is excessive, we must consider the reasonableness of the award in light of the case facts. *Management Computer Servs. v. Hawkins, Ash, Baptie & Co.,* 206 Wis. 2d 158, 194, 557 N.W.2d 67 (1996). Factors a court looks at are: "(1) evil intent deserving of punishment or of something in the nature of special ill-will; or (2) wanton disregard of duty; or (3) gross or outrageous conduct." *Trinity Evangelical Church v. Tower Ins. Co.,* 2003 WI 46, ¶ 45, 261 Wis. 2d 333, 661 N.W.2d 789.

¶ 45. Fleming first argues that the misrepresentations were not made with evil intent. It maintains it did not act unlawfully, as evidenced by the jury's verdict rejecting Betterman's discrimination claim. Further, Fleming argues Betterman did not establish it disregarded a known duty, nor that its conduct was gross or outrageous. However, Morrison and others assured Betterman he would have a job when he got well, even though they knew he had been terminated. There were multiple opportunities for someone to tell Betterman the truth, yet no one did. The jury could have reasonably found that, under the circumstances, Fleming's representations were outrageous.

¶ 46. Second, Fleming contends Betterman suffered no demonstrable harm from the misrepresentations and therefore the punitive damages are excessive compared to compensatory damages. While there must be a reasonable relationship between the amount of compensatory and punitive damages, there is no multiplier or fixed ratio of compensatory to punitive damages. *Management Computer Servs.*, 206 Wis. 2d at 194. Betterman was awarded $255,666 compensatory damages and $300,000 punitive damages. This is a ratio of 1.17:1. The United States Supreme Court has stated that single digit multipliers are most appropriate. *State Farm Mut. Auto. Ins. Co v. Campbell*, 538 U.S. 408 (2003). However, the Wisconsin Supreme Court has recently upheld a ratio as high as 7:1. *See Trinity Evangelical Church*, 2003 WI 46, ¶ 65. Betterman's damage award is not excessive.

¶ 47. Finally, Fleming argues the jury's award of punitive damages could only have been a result of passion after the jury heard the circumstances surrounding Betterman's breakdown. Fleming contends the jury merely felt sorry for him and therefore awarded punitive damages. There is no support in the record for this bald assertion. Fleming's argument is the product of its own imagination rather than any record evidence.

*By the Court.*—Judgment affirmed.